**In re ELECTRONIC DATA SYSTEMS CORPORATION SECURITIES LITIGATION.**

No. 6:03–MD–1512.
No. 6:03–CV–110.

United States District Court,
E.D. Texas,
Tyler Division.

Feb. 11, 2005.

Howard C. Shapiro, Proskauer Rose, New Orleans, LA, Jack Wesley Hill, Otis W. Carroll, Jr., Ireland Carroll & Kelley, PC, Tyler, TX, James Paul Karen, Patricia Jane Villareal, Thomas Ray Jackson, Jones Day, Dallas, TX, Robert Rachal, Proskauer Rose, LLP, New Orleans, LA, Gretchen Sims Sween, Jonathan Eric Bridges, Susman Godfrey LLP, Dallas, TX, Kirk Alan Parry, Jr., Smith Anderson Blount Dorsett Mitchell & Jernigan, Raleigh, NC, Rene E. Thorne, Shook Hardy & Bacon, New Orleans, LA, for Plaintiff.

Barry C. Barnett, Susman Godfrey LLP, Dallas, TX, Robert Izard, Schartz & Noble, Hartford, CT, Ron Kilgard, Keller Rohrback PLC, Phoenix, AZ, David J. Bailey, Michael McConnell, Jones Day, Atlanta, GA, Richard P. Keeton, Nickens Keeton Lawless Farrell & Flack, Houston, TX, Robert H. Klonoff, Jones Day, Kansas City, MO, Robert S. Gans, Alan Schulman, Alicia M. Duff, Bernstein Litowitz Berger & Grossmann, San Diego, CA, Michael B. Himmel, Robert J. Kipnees, Lowenstein Sandler PC, Roseland, NJ, Rochelle Feder Hansen, Bernstein Litowitz Berger & Grossmann, New York, NY, for Defendants.

Karen Lee Hirschman, Vinson & Elkins, Dallas, TX, Christopher J. Gray, Lovell Stewart Halebian, New York, NY, for Movants.

Robert M. Parker, pro se, Parker Clayton, Tyler, TX, for Mediator.

### PRACTICE AND PROCEDURE ORDER NO. 20 (SECURITIES LITIGATION)

DAVIS, District Judge.

Before the Court is Lead Plaintiff New Jersey's Motion for Class Certification, the EDS Defendants' Opposition to New Jersey's Motion for Class Certification, New Jersey's Reply, and Defendants' Sur–Reply (Docket

Nos. 202, 231, 242, and 246, respectively, in 6:03–md–1512, and Docket Nos. 124, 136, 142, and 144, respectively, in 6:03–cv–110). Having considered the parties' written submissions and their oral arguments, the Court GRANTS New Jersey's Motion for Class Certification.

## BACKGROUND [1]

The Department of the Treasury of the State of New Jersey and its Division of Investment, on behalf of Common Pension Fund A ("New Jersey"), seeks to certify itself as the Class Representative for the following class, pursuant to Rules 23(a) and 23(b)(3) of the Federal Rules of Civil Procedure:

> All persons and entities who purchased or otherwise acquired the securities of Electronic Data Systems Corp. ("EDS") between February 7, 2001 through and including September 18, 2002 (the "Class Period"), and who were damaged thereby. Excluded from the Class are defendants, members of the families of each the Individual Defendants, any parent, subsidiary, affiliated, partner, officer, executive, director of any defendant, any entity in which any such excluded person has a controlling interest, and the legal representatives, heirs, successors, and assigns of any such excluded person or entity.

New Jersey is a domestic stock fund created for the purpose of investing the assets of various state pension plans in common stock or securities convertible into common stock. New Jersey is an institutional investor that manages over $28 billion in pension fund assets on behalf of over 600,000 current and retired state employees, including participants in the pension systems for retired state troopers, firefighters, teachers, and judges. During the Class Period, New Jersey purchased 940,000 shares of EDS common stock on the open market, purchases that it attributes to over $42 million in losses.

In Count I of this action, New Jersey alleges EDS and two former executives (collectively "Defendants") concealed adverse material information about EDS' true financial results and business operations and thus violated Section 10(b) of The Exchange Act ("the '34 Act") and Rule 10b–5 promulgated thereunder. In Count II, New Jersey alleges that the two former executives were responsible for the alleged concealment and thus violated Section 20(a) of the '34 Act.

EDS is engaged in the business of providing comprehensive information technology solutions to large companies and the government and derives much of its revenue from large, long-term contracts awarded by such entities. One such contract—the $6.9 billion Navy Marine Intranet Contract ("NMCI Contract")[2] that was to be performed over five to seven years—underlies this action.

The United States Navy awarded EDS the NMCI Contract to create a highly-secure intranet network that would connect approximately 350,000 desktop computers (also called "seats") scattered over approximately 300 military bases worldwide. Although the NMCI Contract encountered serious problems, EDS stock maintained a healthy price. The crux of this securities action is that EDS allegedly failed to disclose these problems, resulting in an inflated stock price, which fell dramatically when the problems came to light.

More specifically, plaintiffs allege that EDS knew of the NMCI Contract's problems and improperly used percentage of completion ("POC") accounting to cover these problems and inflate their stock price. Plaintiffs also allege that EDS misrepresented progress on the NMCI Contract in its press releases and Securities and Exchange Commission ("SEC") filings, again hiding these problems and inflating securities prices. Ac-

---

1. More information about the facts of this case can be found in the Court's Practice and Procedure Order No. 5, denying Defendants' motions to dismiss. See *In re Elec. Data Sys. Corp. Securities Litig.*, 298 F.Supp.2d 544 (E.D.Tex.2004).

2. All parties refer to the contract as the NMCI Contract despite the fact that they have represented to the Court that the contract is named the Navy Marine Intranet Contract. Although the Court speculates that NMCI stands for Navy and Marine Corps Intranet, for ease of reference, the Court will simply refer to the contract as the parties have.

cording to Plaintiffs, defendants Richard H. Brown and James E. Daley, EDS' Chief Executive Officer [3] and Chief Financial Officer [4] respectively, were responsible for the scheme to inflate EDS stock value. Plaintiffs allege that Brown and Daley knew of the NMCI Contract's problems based on their positions at EDS and relationship to the project.

On February 7, 2001, the first day of the proposed class period, Defendants issued a press release reporting fourth quarter and year end revenues for the year 2000 of $5.2 billion and $19.2 billion, respectively. The press release included approximately $10 million in revenue from the NMCI Contract. After the press release, EDS stock rose approximately 10% overnight, from $56.90 on February 7, 2001 to $62.51 on February 8, 2001. Over the following fiscal quarters, until the end of the proposed class period in September 2002, EDS continued to represent ever-increasing earnings and profits. Furthermore, EDS' SEC filings during the proposed class period represented that all accounting procedures were normal and that the company had recognized any losses incurred within each fiscal quarter. During the proposed class period, EDS' stock price continued to rise and market analysts continually recommended purchasing EDS stock. According to Plaintiffs, even after hints that EDS was not performing as well as the market expected, analysts continued to rate EDS well because of confidence garnered by EDS' leadership, specifically Defendants Brown and Daley. Plaintiffs claim Defendants promoted public confidence in EDS by representing that the company had strong internal controls to ensure that all of its accounting and oversight was performed according to the highest standards.

However, on September 18, 2002, EDS revealed in a press release that the company's financial condition was not as it had previously appeared. Furthermore, the September 18th press release followed EDS' most recent rounds of positive reports to investors at the end of the third quarter 2002. In the September 18th press release, EDS reported that expected total revenues were down 2–5% from the previous year and below the 4–6% increase EDS had previously projected. In contrast to the $0.74 earnings per share EDS projected a month earlier, EDS declared that earnings per share would be in the range of $0.12–$0.15. Allegedly as a result of the September 18th announcement, EDS shares plummeted from a closing price of $36.46 per share on September 18, 2002 to a closing price of $17.20 per share on September 19, 2002. Following the September 18 announcement, the SEC began a formal inquiry into the events leading up to the September 18 announcement; that inquiry became a full investigation on January 17, 2003.

## STANDARD OF REVIEW

As proponent of the class, New Jersey bears the burden of showing the case is fit for class treatment. *Berger v. Compaq Computer Corp.*, 257 F.3d 475, 479 (5th Cir.2001). A district court maintains great discretion in certifying a class action, which is essentially a factual inquiry. *Vizena v. Union Pac. R.R. Co.*, 360 F.3d 496, 502 (5th Cir.2004). A district court has inherent power to manage and control pending litigation. *Id.* at 503 (citing *Allison v. Citgo Petroleum Corp.*, 151 F.3d 402, 414 (5th Cir.1998)). In deciding whether to certify a class, a court should consider how the plaintiffs' claims will be tried. *Castano v. Am. Tobacco Co.*, 84 F.3d 734, 744 (5th Cir.1996). While a court should not reach the case's merits, the court must understand the facts, claims, defenses, and substantive law to make a meaningful certification determination. *Id.* The district court must detail with sufficient specificity how Rule 23's requirements have been satisfied. *Id.* A district court's decision to certify a class will be upheld unless the court abuses its discretion or applies incorrect legal standards in reaching its decision. *Id.*

The Court will first analyze whether New Jersey meets all four requirements of Rule 23(a) and then whether it meets one of Rule

---

**3.** Brown served as a director and Chief Executive Officer of EDS from January 1999 until his termination in March 2003.

**4.** Daley served as Executive Vice President and Chief Financial Officer from January 1999 until his reassignment in January 2003.

23(b)'s three requirements. *Vizena*, 360 F.3d at 502. If both Rule 23(a) and Rule 23(b) are met, the Court then certifies a class and addresses the remaining Rule 23 requirements. *Id.*

### RULE 23(a)

Rule 23(a) requires that: (1) the class be so numerous that joinder of all members is impracticable [numerosity], (2) there be questions of law or fact common to the class [commonality], (3) the claims or defenses of the representative parties be typical of the claims or defenses of the class [typicality], and (4) the representative parties fairly and adequately protect the interests of the class [adequacy]. FED. R. CIV. P. 23(a). Each requirement will be discussed in turn.

### A. Numerosity—Rule 23(a)(1)

 The numerosity prong is satisfied if plaintiffs demonstrate some evidence of a reasonable numerical estimate of purported class members. *James v. City of Dallas*, 254 F.3d 551, 570 (5th Cir.2001). A plaintiff need not allege the exact number and identity of the class members, but rather must establish that joinder is impracticable through "some evidence or reasonable estimate of the number of purported class members." *Pederson v. La. State Univ.*, 213 F.3d 858, 868 (5th Cir.2000).

 New Jersey offers numerical estimates of the purported class members that are reasonable enough to prove joinder is impracticable, and EDS does not seriously challenge the numerosity prong of class certification. EDS' Forms 10–K from the years 2000 through 2002 show at least 100,000 record holders of EDS stock throughout the class period. Regardless of what fraction of those stock holders join the class, the class will comfortably exceed the 100–150 person threshold set by the Fifth Circuit as satisfying the numerosity requirement. *See Mullen v. Treasure Chest Casino LLC*, 186 F.3d 620, 624 (5th Cir.1999). Furthermore, because EDS securities were traded on a national market, the securities holders likely reside in many states. "Any class composed of the sellers of a nationally traded security during a period in which hundreds of thou-sands ... of shares of the security were traded" is "necessarily ... so numerous that joinder of all members is impracticable." *Zeidman v. J. Ray McDermott & Co.*, 651 F.2d 1030, 1039 (5th Cir.1981). Thus, New Jersey has satisfied the numerosity prong by showing joinder is impracticable due to the large number of class members and their geographic dispersion.

### B. Commonality—Rule 23(a)(2)

 Commonality is satisfied if plaintiffs demonstrate the existence of questions of law or fact common to the class. *James*, 254 F.3d at 570. This requirement is not demanding and is satisfied if at least one issue's resolution will affect all or a significant number of class members. *Id.* Some plaintiffs having different claims or some claims requiring individualized analysis does not defeat commonality. *Id.* Here again, there is little dispute from Defendants that New Jersey has proven the existence of common questions of law and fact. New Jersey alleges that Defendants made uniform misrepresentations to the investing public in EDS' filings with the SEC and in press releases; these material misrepresentations and omissions artificially inflated the market price of EDS securities, injuring each class member who purchased the artificially priced EDS securities. Accordingly, common questions of law and fact include:

1. whether the documents, reports, filings, releases, and statements disseminated to the class by Defendants during the class period misrepresented material facts about the business performance, financial results, and condition of EDS,

2. whether Defendants acted knowingly, or with severe recklessness in misrepresenting material facts,

3. whether the market price of EDS's securities was indeed artificially inflated during the class period due to the alleged false and misleading statements, and/or

4. whether New Jersey and other members of the class have sustained dam-

ages, and if so, what is the appropriate measure of relief.

Because absent class members would almost certainly have to prove identical facts and answer identical legal questions if they pursued their claims individually, the commonality prong is satisfied.

### C. Typicality—Rule 23(a)(3)

The typicality test is also not demanding and is satisfied if the class representatives' claims or defenses are typical of the class's claims or defenses. *Id.* at 571. Typicality focuses on the similarity between the representatives' and the class members' legal and remedial theories. *Id.* Typicality does not require complete identity of claims, but requires that the representatives' claims share the same essential characteristics with the class members' claims. *Id.* Factual differences do not defeat typicality if the claims arise from a similar course of conduct and share the same legal theories. *Id.*

■ New Jersey argues that the counts it alleges are typical of the claims other class members would bring against Defendants for issuing public statements and documents that misrepresent or omit material facts and artificially inflate prices for EDS securities. In response, Defendants vigorously argue New Jersey cannot meet the typicality requirement because it will be subject to unique defenses due to three circumstances: (1) New Jersey's relationship with KPMG, the auditor for both New Jersey and EDS; (2) New Jersey's purchases of EDS stock after the September 18, 2002 disclosures; and (3) New Jersey's purported failings as a fund manager. As discussed below, none of these concerns will subject New Jersey to unique defenses sufficient to defeat the typicality requirement. New Jersey has shown that its claims are based on the same theories and evidence as the claims of other class members, thus fulfilling the typicality requirement.

#### 1. New Jersey's Relationship with KPMG

Defendants claim New Jersey's relationship with KPMG as its auditor makes New Jersey atypical, because KPMG was also the auditor for EDS. However, reliance on audits from a "Big Four" accounting firm like KPMG does not alone make one subject to unique defenses. KPMG has 1,600 partners, 18,200 employees, and 94 offices. As one of the remaining Big Four firms, it simultaneously counts many large pension funds like New Jersey and many large corporations, including EDS, as clients. Absent any allegations of overlap between the personnel servicing New Jersey and EDS, and absent any reasons that would stop New Jersey from discharging KPMG as its auditor if the particular services New Jersey received were substandard, using the same Big Four firm hardly creates unique defenses that would cast doubt upon whether New Jersey fulfilled its burden of showing typicality.

#### 2. New Jersey's Post–Disclosure Purchases

Two days after the September 18, 2002 disclosures of mismanagement by EDS and the subsequent tumble in stock prices, New Jersey purchased additional shares of EDS stock. Defendants assert those post-disclosure purchases will subject New Jersey to the unique defense that the misrepresentations were not material. However, New Jersey was not alone in purchasing EDS securities after the September 18th announcement. Other institutional investors, including several that may be members of this class, made similar purchases. Like New Jersey, they felt EDS stock had hit a bottom and was thus a good buy at that point in time.

In their briefs and during oral argument, Defendants cited a case from the Second Circuit where class certification was denied because post-disclosure purchases of a security would have subjected the class representative to unique defenses. *Gary Plastic Packaging Corp. v. Merrill Lynch,* 903 F.2d 176 (2d Cir.1990). However, *Gary* is not analogous to the present situation since the unique defenses that the *Gary* class representative faced will not arise in this dispute. *Gary* involved the sale of certificates of deposit ("CDs") advertised by Merrill Lynch as giving the highest available interest rate. Class members bought these CDs on the premise of high interest rates, but it was

later revealed that these CDs actually paid at a rate lower than what was available at many major banks. Despite this revelation, the proposed class representative continued buying these CDs, even though it then knew the CD did not give the highest returns. The Second Circuit ruled that because the class was claiming Merrill Lynch promised high returns and because class members claimed to have purchased the CDs only on the premise of high returns, the class representative would be forced to answer why it continued to purchase these CDs even when it knew the returns were not as high as possible. The Second Circuit held that answering those questions would detract from the class's claims that the CDs were only purchased under the premise of high interest rates. *Id.* at 179–180.

Such questions will not arise in this case, which involves the purchase of common stock and other securities. In *Gary*, the CDs were priced the same before and after the disclosure. *Id.* at 178. Before the disclosure, class members assumed that price was the best rate available, but after the disclosure, and with nothing else changing, class members should have recognized the CDs were not giving the best rates. In this case, although the securities were priced higher before the September 18th disclosures by EDS, both the high and low prices were assumed accurate since the stocks were traded on an efficient market where all information is internalized into the price of a security. Even if class members recognize the obvious— EDS stock was priced lower after the disclosures than before they can still plausibly believe that EDS stock remained a good bargain going forward since the lower price reflects new, and presumably accurate, information, just as the higher price reflected the old, and until then, presumably accurate, information. In *Gary*, the class representative ignored the new information that made the CDs no longer a good purchase, but here, the class representative, and indeed other class members, reasonably assumed the new information was reflected in the new price, arguably making EDS stock a good purchase. Thus, New Jersey will not be subject to unique defenses for making post-disclosure purchases.

### 3. New Jersey's Alleged Poor Performance as a Fund Manager

Defendants also assert that New Jersey's extremely poor performance as portfolio manager of its pension fund will place New Jersey in the atypical position of having to defend its own conduct during the trial. While New Jersey's pension fund may have made some poor investments, here New Jersey only seeks recovery for losses caused by EDS's conduct. Criticisms of New Jersey's overall investment strategy have little bearing on New Jersey's ability to prosecute the losses specific to this case.

### D. Rule 23(a)(4)—Adequacy

 The adequacy determination requires inquiry into the zeal and competence of the representatives' counsel and into representatives' willingness and ability to take an active role in, and control of, the litigation and to protect the absent members' interests. *Berger,* 257 F.3d at 479–82. Differences between the class representatives and the class members do not defeat adequacy unless those differences create conflicts between the representatives and members. *James,* 254 F.3d at 570. "If the Court has substantial doubt as to the adequacy of representation, it should act pursuant to its protective responsibility to deny or revoke class certification," since "attempting to bind absent parties without adequate representation ... not only prejudices the absent class members, but also fails to provide a safe harbor in which the party adverse to the judgment can rest." *Johnson v. Shreveport Garment, Co.,* 422 F.Supp. 526, 533 (W.D.La.1976), *aff'd* 577 F.2d 1132 (5th Cir.1978).

Defendants raise three concerns about New Jersey's adequacy. First, they question how active New Jersey is in the litigation and whether New Jersey, or outside counsel, actually controls the litigation. Second, Defendants argue that the interests of New Jersey conflict with the interests of the members of the class who are also ERISA plaintiffs, and because of this conflict, the class members with a stake in the ERISA litigation are not adequately protected by New Jersey. Third,

they contend that the relationship between New Jersey and KPMG creates the appearance of a conflict of interest, which in turn causes tension between the class representative and members of the class. Defendants suggest in their briefs and in oral argument that if New Jersey is certified as class representative, these concerns could allow absent class members to escape the *res judicata* effect of a judgment against this class, forcing Defendants to bear the cost of re-litigating this case against a new set of plaintiffs.

Although the Court fully recognizes the consequences of certifying an inadequate class representative, Defendants' concerns are unfounded for two reasons. First, New Jersey has proven that it is "willing and able to take an active role in and control the litigation and to protect the interests of absentees," *Berger*, 257 F.3d at 479, and is thus an adequate class representative. New Jersey has retained retired Superior Court Judge C. Judson Hamlin to serve as Special Master and Coordinator for this litigation. Judge Hamlin served twenty-one years on the bench, during which he had statewide responsibilities for complex tort matters and also served as New Jersey's lone representative on the Mass Tort Litigation Committee of the National Conference of State Chief Justices. Judge Hamlin plays an active role on behalf of New Jersey in nearly all facets of this litigation, including: the selection of counsel, the negotiation of counsel's fee-payment schedule, the supervision of counsel, and the regular briefing of state officials on the status of the litigation. Thus, New Jersey, through its representative, Judge Hamlin, is taking an active role in the litigation, affirming its adequacy in protecting the absent class members. Second, as discussed in the sections below, the Court does not believe that any of the Defendants' three concerns raise conflicts or cast doubt on the adequacy of New Jersey. Because New Jersey has proven its adequacy, the Court believes a class represented by New Jersey will adequately represent, and thus bind in judgment, the absent class members. Indeed, despite Defendants' suggestion that West Virginia or some other institutional investors would be a better class representative, the Court believes that Defendants would raise similar complaints if West Virginia or any other class member was named class representative. The Court also notes that despite the concerns raised by Defendants, none of the parties it suggests as a better class representative came forward prior to the January 12, 2005 class certification hearing to suggest that such concerns have merit and are anything more than hypothetical hurdles raised by Defendants.[5]

### 1. *Control of the Litigation*

■ Defendants argue that since Judge Hamlin submits all bills for his services to the two firms serving as New Jersey's outside counsel in this litigation, the litigation is controlled by outside counsel, so New Jersey's interests might not adequately align with the interests of the other plaintiffs in the class. However, that attack is misleading, does little to inform the adequacy analysis, and casts very little doubt upon whether New Jersey has met its burden of establishing that it is an "active, able class representative" who is informed and can demonstrate it is directing the litigation. *Berger*, 257 F.3d at 483.

Despite Defendants' questions as to Judge Hamlin's role, such as whether he is being paid on some sort of impermissible contingency-fee basis, Defendants have failed to show how his employment or pay arrangement raises conflicts that would impute New Jersey's zeal in representing the class. Judge Hamlin was retained by the Attorney General of New Jersey, and it is the Attorney General, not outside counsel, who can terminate his services. His compensation is

5. On January 27, 2005, former lead plaintiff candidates West Virginia Investment Management Board, West Virginia Laborers' Pension Trust Fund, Employer–Teamsters Local Nos. 175 & 505 Pension Trust Fund, and Central States, Southeast and Southwest Areas Pension Fund (collectively the "West Virginia Group") notified the Court of its willingness and ability to serve as lead plaintiff and class representative if New Jersey is not found adequate or typical. While the Court commends the West Virginia Group's collective willingness to step forward and serve as lead plaintiff and class representative if necessary, the West Virginia Group's service is presently not necessary since the Court believes New Jersey is both adequate and typical.

determined by the Attorney General, not outside counsel. The Attorney General reviews and approves each bill Judge Hamlin submits, and only after the Attorney General reviews and approves the bill does outside counsel transfer payment to Judge Hamlin. The Court recognizes that it would be troubling if Judge Hamlin, like outside counsel, was only paid if New Jersey prevailed, but this is not the case. Under New Jersey's arrangement, Judge Hamlin's compensation is assured for as long as he performs in a manner deemed satisfactory by the Attorney General of New Jersey. Judge Hamlin has great incentive to act objectively in protecting the interests of New Jersey and the class of plaintiffs, and little incentive to take actions adverse to New Jersey's interests. With no incentive to take such actions, there is no appearance of a conflict. Furthermore, by virtue of the Attorney General having control over his pay and his actions, Judge Hamlin is in essence a state employee.[6] Indeed, Judge Hamlin's presence helps New Jersey prove it has adequate involvement in the litigation and gives New Jersey the legal muscle a class representative should possess to actively and willingly control the litigation, which is exactly what the Private Securities Litigation Reform Act envisions. *See Berger*, 257 F.3d at 483.

At the same time, Defendants also argue that because Judge Hamlin wields so much power over this litigation, high-ranking New Jersey government officials are uninformed about the prosecution of this litigation. Defendants argue that John McCormac, the Treasurer of New Jersey, Peter Langerman, the Director of the New Jersey Division of Investment, and other high ranking government officials have only generalized knowledge of the case. However, New Jersey has appropriately empowered Judge Hamlin as its agent. It makes perfect sense for New Jersey to delegate this responsibility to him. His knowledge of the case establishes that New Jersey controls the litigation and refutes Defendants' assertions. On the other hand, it makes little sense to expect other state employees, especially those with non-legal specializations like McCormac or Langerman, to be involved in every legal detail of a case of this complexity. Judge Hamlin allows New Jersey to fill the "unoccupied space" the Fifth Circuit envisions between the two extremes of expecting non-legal personnel to master every legal detail and otherwise legally uninformed plaintiffs deferring every decision to counsel. *Berger*, 257 F.3d at 483. In short, the arrangement with Judge Hamlin enhances New Jersey's ability to control the litigation.

### 2. Potential Conflicts with the ERISA Plaintiffs

■ Defendants argue that New Jersey is not an adequate class representative because there are potential conflicts of interest between the proposed class of plaintiffs in the securities case and the plaintiffs in the ERISA class. Defendants claim that although the securities and ERISA cases have many facts in common, the ERISA case is based on a broader theory of loss causation[7] than the securities case and the two cases involve different measures of damages.[8] Defendants also suggest potential conflicts between ERISA and securities plaintiffs over

---

6. The Court notes that under the common law of agency, Judge Hamlin could be considered an employee of the state because the Attorney General has the power to control Judge Hamlin's direction of this litigation. *Cf. Rodriguez v. Sarabyn*, 129 F.3d 760 (5th Cir.1997).

7. Specifically, Defendants argue that New Jersey's theory of loss causation in the securities case conflicts with the ERISA plaintiffs' theory of loss causation since New Jersey claims that its losses were caused solely by Defendants' improper use of POC accounting and other alleged misstatements in connection with the NMCI Contract, while the ERISA plaintiffs claim that their losses on EDS stock were caused by a host of

factors including EDS' allegedly improper use of POC accounting, but also EDS' vulnerability to decreased discretionary spending under certain large contracts, its exposure to certain industries that fared poorly after the collapse of the dot-com market, and its heavy reliance on government contracts other than the NMCI Contract that required large up-front capital expenditures.

8. For example, Defendants claim ERISA allows plaintiffs to recover the gains they would have realized if the funds invested in EDS stock had been invested in an alternate and allegedly more prudent security, while damages under the securities laws are determined by largely statutory means.

trial tactics and settlement strategy. While Defendants correctly recognize the existence of many interrelationships between the securities and ERISA cases, mere interrelation does not necessarily make for fatal conflicts. Indeed, that very interrelation is why the Court has both the ERISA and securities cases on parallel tracks toward trial. The plaintiffs in both cases are pursuing the same goals, so the Court views the two cases as complementary, not conflicting.

The Court does not believe that the concerns raised by Defendants threaten New Jersey's adequacy. In the securities action, New Jersey faces a higher burden of proof in demonstrating that Defendants knowingly or recklessly violated the federal securities laws. If the securities case is tried first and if New Jersey prevails on its securities claims, the ERISA Plaintiffs will have taken a step forward in proving that the ERISA Defendants violated their fiduciary duties by investing in EDS securities. If the securities case is tried first but New Jersey does not prevail on its securities claims, the ERISA Plaintiffs could still arguably proceed because they only need to show Defendants breached a fiduciary duty by investing in EDS securities, an issue that is not being litigated in the securities action. *See Ackerman v. Am. Airlines, Inc.*, 924 F.Supp. 749, 752 n. 8 (N.D.Tex.1995)(for collateral estoppel to apply, the issue at stake must be identical to the one involved in the prior litigation; the issue must have actually been litigated in the prior litigation; and the determination of the issue in the prior litigation must have been a critical and necessary part of the judgment in the earlier action). Thus, the different theories of loss causation create little conflict between New Jersey and members of the class who also have ERISA claims. Likewise, the other areas of conflict suggested by the Defendants—different measures of damages under the securities and ERISA laws, and the securities and ERISA Plaintiffs preferring different trial tactics or settlement strategies—are too speculative to cast doubt upon New Jersey's adequacy.

If Defendants are correct that under New Jersey's proposed class definition, EDS' 401(k) Plan could claim to be an entity that purchased or otherwise acquired EDS securities, or alternatively, members of the ERISA class could claim to be persons who purchased or otherwise acquired EDS securities, the Court could have to decide how to precisely allocate damages to the 401(k) Plan and/or the ERISA plaintiffs if the securities class prevails. However, potential complications that may arise during the damages phase of a trial do not bar a finding of adequacy. *Cf. Shankroff v. Advest, Inc.*, 112 F.R.D. 190, 194 (S.D.N.Y.1986)(certifying a class and then noting a district court "can later subdivide the class or order separate hearings to determine issues of … damages"). The adequacy analysis focuses on the class representative's ability to vigorously and actively represent the class, and the Court believes that New Jersey has demonstrated its adequacy and that the conflicts suggested by Defendants are unpersuasive.

3. *New Jersey's Relationship with KPMG*

██ During the lead-plaintiff determination earlier in this case, a prospective lead plaintiff (Marshall Kwait) filed a brief arguing that KPMG was a critical defendant and that New Jersey was subject to a disabling conflict because KPMG is the outside auditor to both EDS and New Jersey. Defendants now contend that this shows New Jersey is unwilling to sue potential defendants and is thus unable to adequately represent the interests of the class. However, "failure to join all defendants is a strategy choice and except for a showing of unique circumstances, is probably not ground for finding inadequacy." *Paper Sys. Inc., v. Mitsubishi Corp.*, 193 F.R.D. 601, 611 (E.D.Wis.2000)(citing 3 Herbert B. Newberg & Alba Conte, *Newberg on Class Actions*, § 17.12 at 17–32 (3d ed.1992)). Defendants cannot establish unique circumstances in New Jersey's relationship with KPMG. Indeed, as the Court has already noted, it is unremarkable that a large corporation like EDS and a large institutional investor like New Jersey use the same Big Four accounting firm.

Defendants' assertion that New Jersey's decision to not sue KPMG is analogous to the

lead plaintiff in *Paper Systems* being dismissed as class representative in an antitrust action for not suing an alleged cartel member is without merit. In *Paper Systems,* a member of the accused cartel was "named as a defendant and shortly thereafter ... dismissed by [ ] class representative for wholly self-interested reasons—render[ing][the] case sufficiently unique." *Id.* at 611. The defendant was the class representative's largest supplier and was dismissed so the class representative could maintain its "good relationship with them." *Id.* The court ruled that the dismissal rendered the lead plaintiff an inadequate class representative since the lead plaintiff put its "self interest" above its "undivided loyalty" to the class. *Id.*

Here, New Jersey has no self-interest in protecting KPMG. New Jersey has shown its zeal in pursuing class interests, even when those interests conflict with KPMG's interests. For example, New Jersey pursued a motion to compel KPMG to produce its audit workpapers for EDS, as well as the transcripts of its testimony before the SEC. New Jersey has also stated that it is willing to sue all viable defendants, even KPMG, if the facts lead there; thus far, the facts have not led to suing KPMG. New Jersey is only a client of KPMG—not vice versa—so it has no self-interest in appeasing KPMG. Unlike the lead plaintiff in *Paper Systems,* New Jersey would not necessarily benefit financially by maintaining a good relationship with KPMG. Thus, the Court does not believe there are unique circumstances here that threaten adequacy.

### RULE 23(b)

A class that satisfies all four of Rule 23(a)'s requirements must then satisfy one of Rule 23(b)'s three requirements. These requirements are aimed at finding a balance between the need for, and efficiency of, a class action and the class members' interests in pursuing their claims separately or not at all. *Allison,* 151 F.3d at 412. The three requirements are arranged according to the nature or effect of the relief sought. *Id.* New Jersey does not try to argue that it can fulfill Rule 23(b)(1) or Rule 23(b)(2), so the Court proceeds directly to Rule 23(b)(3).

Under Rule 23(b)(3), a court may certify a class if questions of law or fact predominate over questions affecting individual class members [predominance], and if a class action would be superior in fairness and efficiency to other available adjudication methods [superiority]. FED. R. CIV. P. 23(b)(3).

### A. Predominance

Predominance does not require all questions of law or fact to be common, but only that common questions predominate over individual questions. Because courts generally focus on liability issues in deciding whether the predominance requirement is met, "predominance is a test readily met in certain cases alleging consumer or securities fraud or violations of antitrust laws." *Amchem Prods., Inc. v. Windsor,* 521 U.S. 591, 625, 117 S.Ct. 2231, 138 L.Ed.2d 689 (1997). Here, the liability issues turn upon whether Defendants made materially false and misleading statements with the required scienter, and whether Plaintiffs relied on these statements. Because New Jersey has shown, and Defendants do not directly dispute, that in general the market for EDS stock was efficient, reliance can be presumed for any plaintiff. If Defendants are liable to New Jersey for these statements, they are liable to all other class members for the same statements, so common questions predominate.

### B. Superiority

Rule 23(b)(3) provides four factors for a court to consider when weighing superiority: (A) the class members' interest in individually controlling their separate actions, (B) the extent and nature of existing litigation by class members concerning the same claims, (C) the desirability of concentrating the litigation in the particular forum, and (D) the likely difficulties of managing a class action. FED. R. CIV. P. 23(b)(3). Applying each of the four factors to this case shows that trying the securities claims as a class action outweighs not certifying a class and allowing the claims to be tried individually. First, there is no indication that any member of the class would prefer to prosecute its own claim, especially since this is a sophisticated

action involving extensive. discovery that would be impractical for any one individual to control. Second, other than these consolidated cases, there are no known individual actions brought by class members concerning this controversy. Third, as recognized by the multi-district litigation panel, it is desirable to concentrate all the securities actions in one forum. Fourth, aside from the usual complexities encountered in class action litigations, there are few exceptional difficulties from litigating these claims as a class instead of individually. The Court believes these four factors demonstrate New Jersey has carried its burden of showing superiority.

■■■ Defendants argue that by failing to submit a trial plan, New Jersey cannot carry its burden of showing superiority. In support of their argument, they accuse New Jersey of putting forth the same "figure it out as we go along approach" that the Fifth Circuit recently frowned upon in *Robinson v. Tex. Auto. Dealers Ass'n.*, 387 F.3d 416, 426 (5th Cir.2004). While "in considering the superiority requirement, a district court must . . . consider how a trial on the alleged causes of action would be tried," *id.* at 425, a proposed class representative is not required by *Robinson* to submit a trial plan to establish superiority. In *Robinson*, the main superiority problem was not a lack of a trial plan. Rather, the district court simply assumed it did not need to consider how the claims would be tried since it only conditionally certified the class. *Id.* Predominance also was not met in that case, which changes the dynamics of the superiority analysis since superiority generally flows from there being predominance of common questions. Here, predominance has been established, and the Court has carefully considered any possible difficulties in a trial on the alleged cause of action, so *Robinson* is inapplicable and New Jersey does not need to submit a trial plan to establish superiority.

The Court recognizes that the class includes the holders of equity-based securities, debt-based securities, and hybrid securities. Because preferred stock or debentures may be impacted by different factors than common stock, the holders of those securities may have different interests and thus different claims, and may eventually require creating a subclass.[9] Although New Jersey's misrepresentation and reliance claims are based on the fraud-on-the-market presumption, Defendants may argue that the presumption does not apply here if New Jersey relied on analyst statements, not just statements from EDS. However, all class members, regardless of the type of security they hold, would have been harmed by the same false and misleading public statements alleged in the securities actions, all of which were contained in the same public filings and press releases. Thus, the fact that New Jersey purchased EDS common stock while other class members purchased other types of EDS securities creates no conflicts that would affect the management of this case. Despite the questions Defendants raise, the Court concludes New Jersey has shown that a class action is superior.

## RULE 23(g)

Unless provided otherwise by statute, when a court certifies a class, the court must appoint class counsel. FED. R. CIV. P. 23(g)(1)(A). The appointed counsel must fairly and adequately represent the class's interests. FED. R. CIV. P. 23(g)(1)(B). In making such an appointment, there are a variety of factors the court should consider. The court must consider: counsel's work in identifying or investigating the class's claims; counsel's class-action, complex litigation, and similar claims experience; counsel's knowledge of the applicable law; and counsel's resources committed to class representation. FED. R. CIV. P. 23(g)(1)(C)(i). The court may consider other matters pertinent to counsel's ability to fairly and adequately represent the class's interests. FED.R.CIV.P.23(g)(1)(C)(ii).

---

9. Presently, the Court does not believe that creating subclasses are necessary, but the Court can later certify subclasses if problems manifest. *See* FED. R. CIV. P. 23(c)(1)(C). *See also Constance Sczesny Trust v. KPMG LLP*, 223 F.R.D. 319 (S.D.N.Y.2004); *In re First Alliance Mortg. Co.*, 269 B.R. 428 (C.D.Cal.2001); *Flanigan v. Gen. Elec. Co.*, 242 F.3d 78 (2d Cir.2001); *Powers v. Stuart–James Co.*, 707 F.Supp. 499 (M.D.Fla. 1989); *Stavrides v. Mellon Bank, N.A.*, 69 F.R.D. 424 (W.D.Pa.1975).

New Jersey proposes the law firms of Bernstein, Litowitz, Berger & Grossmann LLP and Greenbaum, Rowe, Smith, Ravin, Davis & Himmel LLP be appointed as Lead Class Counsel, and the law firm of Nickens, Keeton, Lawless, Farrell & Flack LLP be appointed as Liaison Class Counsel. Defendants do not object to proposed class counsel's competency or allege any conflicts that disqualify the proposed counsel. Thus, pursuant to Fed.R.Civ.P. 23(g), the Court appoints the law firms of Bernstein, Litowitz, Berger & Grossmann LLP and Greenbaum, Rowe, Smith, Ravin, Davis & Himmel LLP as Lead Class Counsel, and the law firm of Nickens, Keeton, Lawless, Farrell & Flack LLP as Liaison Class Counsel.

## CONCLUSION

The Court hereby **GRANTS** New Jersey's Motion for Class Certification. The Court certifies New Jersey as the Class Representative for the following class, pursuant to Rules 23(a) and 23(b)(3) of the Federal Rules of Civil Procedure:

All persons and entities who purchased or otherwise acquired the securities of Electronic Data Systems Corp. ("EDS") between February 7, 2001 through and including September 18, 2002 (the "Class Period"), and who were damaged thereby. Excluded from the Class are defendants, members of the families of each the Individual Defendants, any parent, subsidiary, affiliated, partner, officer, executive, director of any defendant, any entity in which any such excluded person has a controlling interest, and the legal representatives, heirs, successors, and assigns of any such excluded person or entity.

To fulfill the requirements of Rule 23(c)(2)(B) of the Federal Rules of Civil Procedure, the Court orders the parties to meet and jointly draft a proposed notice of class certification. The parties must submit to the Court an agreed upon notice by 5:00 PM CST on March 1, 2005. If the parties are unable to reach an agreement on a proposed notice, they must jointly submit to the Court by 5:00 PM CST on March 1, 2005 a draft of the notice that includes their areas of mutual agreement and highlights any areas of disagreement. To highlight the areas of disagreement, New Jersey's proposed text in each area of disagreement should be in bold and the Defendants' proposed text in each area of disagreement should be italicized. Based on the parties' joint submission, the Court will promptly issue a final version of the notice and order New Jersey to send the notices to class members to inform them of their rights as members of the class.