**Joel ROSEN, individually and on behalf of all others similarly situated, Plaintiffs,**

**v.**

**TEXTRON, INC., Lewis B. Campbell, John A. Janitz, and Theodore R. French, Defendants.**

**Leslie Turbowitz, individually and on behalf of all others similarly situated, Plaintiffs,**

**v.**

**Textron, Inc., Lewis B. Campbell, John A. Janitz, and Theodore R. French, Defendants.**

**C.A. Nos. 02–190–S, 02–264–S.**

United States District Court, D. Rhode Island.

May 11, 2005.

Barry J. Kusinitz, William M. Kolb, Kaplan & Kolb, Providence, RI, Michael Behn, Futterman & Howard, Chtd., Chicago, IL, Ira M. Press, Kirby McInerney & Squire LLP, New York City, for Plaintiffs.

John A. Tarantino, Kristen W. Sherman, Todd D. White, Adler, Pollock & Sheehan, PC, Providence, RI, Peter J. Beshar, Mitchell A. Karlan, Anthony J. Mahajan, Aric H. Wu, Gibson, Dunn & Crutcher, LLP, New York City, for Defendants.

### *DECISION AND ORDER*

SMITH, District Judge.

I. *Introduction*

Three benefit funds for the International Brotherhood of Teamsters Local 710 (Local 710 Pension Fund, Local 710 Employees' Pension Fund, and Local 710 Health & Welfare Fund (collectively, "Local 710")), along with William Swartchild III ("Swartchild," and together with Local 710, "Plaintiffs")[1] seek to be certified as

---

1. Joel Rosen and Leslie Turbowitz are named as plaintiffs in the caption because they filed

the original claims in this case. However, the cases have since been consolidated and Local

class representatives for a class of investors who purchased common stock of Textron, Inc. ("Textron"), between October 19, 2000, and September 26, 2001 (the "Class Period"). Plaintiffs allege this group of investors was defrauded: (1) as a result of various material misstatements made by Textron, Inc. ("Textron"), Lewis B. Campbell, John A. Janitz, and Theodore R. French (collectively, "Defendants") concerning the success of various helicopter procurement contracts between Textron and the United States Department of Defense ("DOD"); and (2) as a result of improper accounting practices in connection with the acquisition of a business by Textron. The misstatements are alleged to have been part of a securities fraud on the part of Textron, perpetrated for the purpose of delaying required accounting adjustments. Plaintiffs seek damages under two counts: (1) violation of Section 10(b) and Rule 10b–5 of the Securities Exchange Act of 1934 (the "Exchange Act"); and (2) violation of Section 20(a) of the Exchange Act (control person liability).[2] This Court previously held that the Plaintiffs' claim was sufficient to withstand the heightened pleading requirements of the Private Securities Litigation Reform Act ("PSLRA"). *Rosen v. Textron, Inc.*, 321 F.Supp.2d 308, 312–16 (D.R.I.2004). Now before this Court is Plaintiffs' Motion for Class Certification pursuant to Rule 23 of the Federal Rules of Civil Procedure.

## II. *Plaintiffs' Allegations*

For purposes of ruling on Plaintiffs' Motion, a summary of Plaintiffs' allegations will suffice. Those wishing more detail should refer to this Court's opinion in *Rosen*, 321 F.Supp.2d at 312–16.

First and foremost, Plaintiffs allege Defendants engaged in fraudulent accounting practices by delaying required accounting adjustments with respect to Textron's V–22 Osprey Tiltrotor helicopter (the "V–22" or "Osprey") program. Specifically, Plaintiffs allege Defendants repeatedly became aware of information during the Class Period indicating the V–22 program would incur additional costs and extended production schedules, and that under Generally Accepted Accounting Principles ("GAAP") they were required to adjust their financial statements at the time they received this information rather than wait until later. Plaintiffs allege that Defendants' failure to adjust their financial statements accordingly allowed them to counter negative information regarding the Osprey program that did reach the market with improperly inflated earnings releases. For example, according to Plaintiffs, Defendants followed the report of an April 8, 2000, Osprey test flight crash with an October 19, 2000, announcement of a 14%

710 has been appointed lead plaintiff. *See Rosen v. Textron, Inc.*, No. C.A. 02–190L (D.R.I. Sept. 27, 2002) (memorandum and order of M.J. Lovegreen).

2. Section 10(b) of the Exchange Act provides: "It shall be unlawful for any person ... [t]o use or employ, in connection with the purchase or sale of any security ... any manipulative or deceptive device...." 15 U.S.C. § 78j(b). Rule 10b–5 provides: "It shall be unlawful for any person ... [t]o make any untrue statement of a material fact or to omit to state a material fact ... in connection with the purchase or sale of any security." 17

C.F.R. § 240.10b–5. Section 20(a) of the Exchange Act provides:

Every person who, directly or indirectly, controls any person liable under any provision of this chapter ... shall also be liable jointly and severally with and to the same extent as such controlled person to any person to whom such controlled person is liable, unless the controlling person acted in good faith and did not directly or indirectly induce the act or acts constituting the violation or cause of action.

15 U.S.C. § 78t(a).

earnings per share increase; followed the report of a December 12, 2000, crash and report of the DOD convening a "Blue Ribbon Panel" (the "Panel") to investigate the accidents and to determine whether production of the V–22s should continue with a January 23, 2001, report of double-digit earnings growth; and followed an April 19, 2001, Panel report recommending limiting production of the Osprey with a same-day announcement of increased profit in Textron's aircraft business segment.

On September 26, 2001, Textron announced an expected loss. The Plaintiffs allege that much of the loss announced on September 26 was due to a fifty-two cent per share adjustment against earnings that Textron attributed to lengthened production schedules and additional costs associated with design changes in the V–22 program. Plaintiffs contend that the September 26, 2001, accounting adjustments should have been made in October 2000 when the Defendants became aware that additional costs and production setbacks would affect the Osprey program.

The second allegation claims that during the Class Period, Textron contracted with the DOD to upgrade 280 H–1 "Super–Huey" Attack Helicopters (the "H–1") and that the H–1 program, like the V–22 program, encountered increased expenses, reduced profitability, and a delayed production schedule as early as October 2000. Plaintiffs claim that Textron also failed to adjust its accounting methods in light of these developments.

Finally, the Complaint makes claims regarding Textron's acquisition of Omniquip, an industrial equipment manufacturer, in 1999 at a cost of $477 million. At the time it acquired Omniquip, Textron recorded Omniquip's goodwill as an intangible asset. In October 2000, Textron announced a restructuring program designed to address decreased profitability in its Omniquip subsidiary. As part of this restructuring program, Textron took a writedown for impaired goodwill at Omniquip on September 26, 2001. The Plaintiffs contend that GAAP required Textron to take the goodwill impairment charge relating to Omniquip as early as October 2000.

### III. *Standard of Review*

Rule 23 of the Federal Rules of Civil Procedure sets forth the requirements for class action certification. In order for a class to be certified, all the elements of Rule 23(a) must be satisfied. Rule 23(a) provides that class certification is permissible where:

> (1) the class is so numerous that joinder of all members is impracticable, (2) there are questions of law or fact common to the class, (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class, and (4) the representative parties will fairly and adequately protect the interests of the class.

Fed.R.Civ.P. 23. In addition to satisfying all the requirements of Rule 23(a), one of either Rule 23(b)(1), (2) or (3) must also be satisfied. In this case, Plaintiffs are relying on 23(b)(3), which requires that "the questions of law or fact common to the members of the class predominate over any questions affecting only individual members, and that a class action is superior to other available methods for the fair and efficient adjudication of the controversy." Fed.R.Civ.P. 23(b)(3).

"The moving party has the burden of proving that its claims are appropriate for class certification under Rule 23." *Rolex Employees Ret. Trust v. Mentor Graphics Corp.*, 136 F.R.D. 658, 662 (D.Or.1991). However, "[s]ecurities actions are considered particularly appropriate for class action treatment." *Id.*

Defendants only challenge Plaintiffs' Motion on the typicality of Local 710 under 23(a)(3) and the adequacy of Swartchild under 23(a)(4). Accordingly, this Court will limit its discussion to the analysis of typicality and adequacy as to Local 710 and Swartchild respectively. This Court's review of the record leads it to conclude Plaintiffs have carried their burden as to the other elements of Rule 23(a) and (b)(3).

## IV. *Local 710's Typicality*

 Generally, a plaintiff's claim is typical if it arises from the same event or practice or course of conduct that gives rise to the claims of other class members and his or her claims are based on the same legal theory. Similarity of legal theory may satisfy the typicality requirement even in the face of factual distinctions. However, where it is predictable that a major focus of the litigation will be on an arguable defense unique to the named plaintiff or a small subclass, then the named plaintiff is not a proper class representative.

*Epstein v. Am. Reserve Corp.*, No. 79 C 4767, 1988 WL 40500, at *3 (N.D.Ill. Apr. 21, 1988) (internal citations, alterations and quotation marks omitted).

In this case, all the relevant investment decisions of Local 710 were made by two investment managers: Oppenheimer Capital and Bear Stearns Asset Management Inc. ("Bear Stearns"). Plaintiffs do not challenge Defendants' opposition to the inclusion of any purchases by Oppenheimer Capital in Plaintiffs' claims. Indeed, all the Oppenheimer· purchases fall outside the Class Period. Thus, only purchases by Bear Stearns on behalf of the Local 710 Funds are in issue. Furthermore, because Bear Stearns purchased all the relevant Textron stock on behalf of Local 710 during the Class Period in exercise of its discretion as Local 710's investment advis-or, analysis of Bear Stearns's actions in connection with those purchases (and testimony related thereto) is the key to the resolution of the motion before this Court as it pertains to Local 710. Defendants make five separate claims regarding Local 710's purchases made by Bear Stearns.

### A. *Post–Class Purchases*

Defendants assert that Local 710 cannot serve as class representative because it is subject to a unique defense due to the fact that Bear Stearns continued to purchase Textron stock on Local 710's behalf even after the September 26, 2001, announcement. Defendants reason that Bear Stearns could not have relied on the information contained in the alleged misrepresentations when it made its decisions to purchase Textron stock during the Class Period (as it must under Plaintiffs' theory of this case) if they continued to purchase Textron stock following the revelation that such information was not correct. To support this proposition, Defendants cite *In re Safeguard Scientifics*, 216 F.R.D. 577, 582 (E.D.Pa.2003) (concluding lead plaintiff was subject to unique defenses in part because he "increased his holdings in Safeguard stock even after public disclosure of the alleged fraud"); *Kovaleff v. Piano*, 142 F.R.D. 406, 408 (S.D.N.Y.1992) (finding unique defense where "plaintiffs increased their holdings of Mizlou common stock after disclosure of the alleged fraud"); *Rolex*, 136 F.R.D. at 664 (concluding plaintiff was subject to unique defense where he "continued to trade in the stock in Mentor Graphics after he learned of the alleged misrepresentations of defendants"); and *Epstein*, 1988 WL 40500, at *3–4 ("The problem in this case, however, is that Herb Jablin is subject to unique lack of reliance defenses. First, and most striking, is the fact that purchases of ARC securities were made in both the Epstein and Wenger

accounts after the alleged fraudulent information had become known.").

Plaintiffs, however, counter with several recent cases from many of the same jurisdictions, which they describe as constituting the majority view. *See In re Rent–Way Sec. Litig.,* 218 F.R.D. 101, 114 (W.D.Pa.2003) ("[T]hese purchases, having occurred after the putative class period, are irrelevant to the instant litigation."); *In re Nortel Networks Corp. Sec. Litig.,* No. 01 Civ. 1855(RMB), 2003 WL 22077464, at *3 n. 4 (S.D.N.Y. Sept. 8, 2003) (rejecting argument that plaintiff's purchase of defendant's stock "well after the alleged 'fraud' was 'exposed'" makes plaintiff atypical of class); *In re Frontier Ins. Group, Inc. Sec. Litig.,* 172 F.R.D. 31, 42 (E.D.N.Y.1997) ("The fact that Taub attempted to recoup her losses by continuing to purchase Frontier stock after the disclosure of the alleged misrepresentations has no bearing on whether or not she relied on the integrity of the market during the class period."); *In re Bally Mfg. Sec. Corp. Litig.,* 141 F.R.D. 262, 269 n. 7 (N.D.Ill.1992) ("Bally's contention that plaintiff Karinsky's claims are atypical because he purchased stock *after* the proposed class period is unavailing.") (emphasis in original).

While there are factual distinctions between and among the cases cited by the parties, the critical question is whether a broker's decision to purchase stock at or near its nadir precludes that broker's client from claiming it was the victim of securities fraud as to purchases made on its behalf when the price was at or near its apex. In this Court's view, the fact that Bear Stearns concluded, for example, that Textron stock was a good buy at $32.77, following full disclosure, is essentially irrelevant to the question whether it relied on misleading information in buying Textron stock at, for example, $50.51 during the Class Period. It is this question (whether the purchase at $50.51, and other allegedly inflated prices, was premised on misleading information) which will be resolved at trial. Should the evidence lead a jury to conclude that Plaintiffs were in fact misled, Defendants will find no defense to liability unique to Bear Stearns merely on the basis of its post-Class Period purchases.

**B.** *Non–Reliance on Earnings Statements*

■ Plaintiffs allege that the price of Textron stock during the Class Period was inflated by incorrect earnings statements that improperly served to mitigate various pieces of bad news regarding segments of Textron's business. Defendants argue that Local 710 is subject to unique defenses to this allegation because Bear Stearns did not rely on earnings statements in making its purchasing decisions. *See Basic Inc. v. Levinson,* 485 U.S. 224, 243, 108 S.Ct. 978, 99 L.Ed.2d 194 (1988) ("[R]eliance is an element of a Rule 10b–5 cause of action."). Specifically, Defendants point to deposition testimony of James McClusky, senior managing director and co-chief investment officer of institutional equity investment management for Bear Stearns, which contains the following exchange:

Q: If, prior to the purchase of the Textron stock, you had known that Textron was materially overbooking revenue with respect to the 22 Osprey and that, when this fact was disclosed, the price would drop dramatically, would that have affected your investment decision?

. . . .

THE WITNESS: We try to look through a lot of that to get at the actual cash flow the business is generating, so my sense is that back in that time we were on—we were on something called

the CFRA. We used that really—so it is a Center for Financial Research and Analysis, and they're accounting sleuths, and they go through and look how cash flow is diverse from their income, and we do a lot of that ourselves.

So you can—you can ferret a lot of that out through looking at cash flows, as opposed to a quarterly earnings, and we have been pretty good at that, which is why we avoided a lot of blowups like Enron and World Comm [sic] and so on; so my sense is that—that our analysis at the time looked through a lot of that stuff, and the extent that it—that it materially distorted cash flows, which I don't think it did, it may have affected them, but—

. . . .

Q: What materially distorted cash flows? I'm sorry.

A: I'm saying that had that materially distorted our estimates of cash flow and free cash flow, then—then it may have, but again, we are looking at free cash flow more than we are looking at reported earnings, and so a lot of that stuff just kind of doesn't come through the free cash flow number.

(McClusky Dep. at 82–83.)

Furthermore, Defendants point out that Bear Stearns could not have relied on any mitigating effect of the allegedly fraudulent earnings statements as to the health of the Osprey program because it had already calculated in the potential entire loss of that program in its analysis. (*See id.* at 82 ("we incorporated both the loss of that program and what it would do to the company in our—in our estimate of how that would impact the company").)

Plaintiffs respond by pointing to other McClusky deposition testimony that suggests Bear Stearns incorporated a number of factors, including earnings, into their analysis. (*Id.* at 20 ("we estimate, based on normalized earnings and cash flow, as what a business is worth"), 21 ("We do relative price-to-earnings ratio.").) In addition, argue Plaintiffs, while Bear Stearns clearly did recognize there was risk involved in the Osprey program, this did not mean that Bear Stearns based its decisions to buy Textron stock on an assumption that the Osprey program would fail. (*See id.* at 70 ("We didn't think for sure it would be cancelled, and we didn't necessarily assume that it would proceed and be very profitable for the company. We just, you know, recognized that there was an upside if it worked and possible down side if they had to cancel the program.").) The key here, as far as Plaintiffs are concerned, is that the new earnings information released on September 26 impacted Bear Stearns's estimates of the value of Textron. (*See id.* at 55 ("that new information, it—it impacted price more than it impacted the estimate—our estimate of intrinsic value").) This Court agrees with Plaintiffs that the deposition testimony of McClusky does not demonstrate such a disinterest in earnings or the health of the Osprey program on the part of Bear Stearns so as to take it outside the four corners of the Amended Complaint.

Furthermore, Plaintiffs argue more globally that since they are advancing a fraud-on-the-market theory to satisfy the reliance element of their claim, the issue is not which specific pieces of public information Bear Stearns relied on in making its purchasing decisions, but rather whether it relied on anything other than publicly available information. If it did not, then it gets the benefit of a presumption that it was relying on the (mis)information that was absorbed by the market and reflected in the market price.

In *Basic*, the Supreme Court summarized the fraud-on-the-market presumption by stating:

An investor who buys or sells stock at the price set by the market does so in reliance on the integrity of that price. Because most publicly available information is reflected in market price, an investor's reliance on any public material misrepresentations, therefore, may be presumed for purposes of a Rule 10b–5 action.

485 U.S. at 247, 108 S.Ct. 978. The Court also set forth how the presumption could be rebutted:

Any showing that severs the link between the alleged misrepresentation and either the price received (or paid) by the plaintiff, or his decision to trade at a fair market price, will be sufficient to rebut the presumption of reliance. For example, if petitioners could show that the "market makers" were privy to the truth about the merger discussions here with Combustion, and thus that the market price would not have been affected by their misrepresentations, the causal connection could be broken: the basis for finding that the fraud had been transmitted through market price would be gone. Similarly, if, despite petitioners' allegedly fraudulent attempt to manipulate market price, news of the merger discussions credibly entered the market and dissipated the effects of the misstatements, those who traded Basic shares after the corrective statements would have no direct or indirect connection with the fraud. Petitioners also could rebut the presumption of reliance as to plaintiffs who would have divested themselves of their Basic shares without relying on the integrity of the market. For example, a plaintiff who believed that Basic's statements were false and that Basic was indeed engaged in merger discussions, and who consequently believed that Basic stock was artificially underpriced, but sold his shares nevertheless because of other unrelated con-

cerns, e.g., potential antitrust problems, or political pressures to divest from shares of certain businesses, could not be said to have relied on the integrity of a price he knew had been manipulated.

*Id.* at 248–49, 108 S.Ct. 978.

The Fifth Circuit has summarized the foregoing by stating that a defendant can rebut the fraud-on-the-market presumption of reliance by showing: "(1) that the nondisclosures did not affect the market price, or (2) that the Plaintiffs would have purchased the stock at the same price had they known the information that was not disclosed; or (3) that the Plaintiffs actually knew the information that was not disclosed to the market." *Fine v. Am. Solar King Corp.*, 919 F.2d 290, 299 (5th Cir. 1990). Applying the *Basic* standard, this Court concludes that the deposition evidence of McClusky cited by Defendants does not rebut the presumption of reliance granted Plaintiffs under their fraud-on-the-market theory.

## C. *Non–Reliance on Price of Stock as Reflecting Value*

Defendants do not give up the fight easily, however, and cite cases such as *Zlotnick v. TIE Communications*, 836 F.2d 818 (3d Cir.1988), for the proposition that merely purchasing a stock on the basis of a belief that it has been undervalued by the market is sufficient to rebut the fraud-on-the-market presumption. *See id.* at 823 ("[S]ince Zlotnick decided that the market price was not an accurate valuation of the stock at the time of his short sale, we should not presume that it was reasonable for him to rely on the market price at the time of his purchase. We therefore decline to presume that Zlotnick relied on defendant's alleged misrepresentations in deciding to cover his purchase."); *see also McGuinness v. Parnes*, Civ.A. No. 87–

2728, 1988 WL 66214, at *3 (D.D.C. June 17, 1988) (concluding fraud-on-market presumption rebutted where "McGuinness did not believe that the market price reflected the market value of the stock. He believed that the market price was less than the value of the stock."). They point out that Bear Stearns believed Textron was undervalued by the market, and that thus the presumption is rebutted.

This Court agrees with the observation of the court in *Argent Classic Convertible Arbitrage Fund L.P. v. Rite Aid Corp.,* 315 F.Supp.2d 666 (E.D.Pa.2004), when it stated that "[b]ecause all rational investors purchase and sell securities when they believe that they can make profits because the securities are either undervalued or overvalued, the reasoning of *Zlotnick* ... would effectively eviscerate the fraud on the market theory of presumptive indirect reliance," *id.* at 676 n. 13. This Court is aware that the fraud-on-the-market presumption has "invited some criticism from the legal community." *Ballan v. Upjohn Co.,* 814 F.Supp. 1375, 1381 n. 2 (W.D.Mich.1992) (citing Jonathan R. Macey & Geoffrey P. Miller, *Good Finance, Bad Economics: An Analysis of the Fraud–on–the–Market Theory,* 42 Stan. L.Rev. 1059 (1990)). "However, as it is the law that currently governs, this court must follow the decision specified in the *Basic* opinion." *Id.* Accordingly, this Court must find Local 710 not subject to a unique defense because Bear Stearns believed Textron stock was undervalued when it bought shares during the Class Period. *See Moskowitz v. Lopp,* 128 F.R.D. 624, 631 (E.D.Pa.1989) ("The fact that these traders have divergent motivations in purchasing shares should not defeat the fraud-on-the-market presumption absent convincing proof that price played *no* part whatsoever in their decision making.") (emphasis in original).

### D. *Bear Stearns (and therefore Local 710) was Not Misled*

■ Defendants argue that Local 710 is subject to a unique defense because Bear Stearns states it was not misled. (*See* McClusky Dep. at 68 ("Q: Do you believe that you were misled in connection with the purchase of Textron stock? A: No.").) There appear to be two prongs to this argument: (1) that Bear Stearns's testimony that it was not misled places Local 710 out of the class of plaintiffs established by the Amended Complaint; and (2) that Bear Stearns's testimony that it was not misled means that whatever misinformation may have been disseminated was immaterial to Local 710's acquisition of Textron stock during the Class Period.

As to the first argument, Defendants contrast Plaintiffs' Amended Complaint, which states that "the marketplace had no inkling that [Textron] was not properly accounting for its V–22 and H–1 contracts during the Class Period" and that Textron's September 26 announcement "shocked investors," with McClusky's testimony that he was not misled in deciding to purchase Textron stock. Plaintiffs, however, point out (and Defendants do not contest the point) that at the time of his statement McClusky was not aware of all the alleged improprieties of Textron and thus his testimony might change once he is made aware of all the relevant facts. Furthermore, Plaintiffs point to paragraph 262 of the Amended Complaint as setting forth the key allegations of their claim. Paragraph 262 states:

As a result of the dissemination of the materially false and misleading information and failure to disclose material facts ... the market price of Textron's securities was artificially inflated during the Class Period. In ignorance of the fact that market prices ... were artificially inflated, and relying directly or indirect-

ly on the false and misleading statements ... plaintiffs and other members of the Class acquired Textron securities during the Class Period at artificially high prices ....

(Pls.' Consolidated Am. Compl. at ¶ 262.)

A failure to be "shocked" by the September 26 announcement does not take one outside the parameters of the proposed class. This Court declines to find Local 710 precluded from serving as a class representative on the apparent failure of its broker to respond in this fashion.

As to McClusky's testimony raising the specter of immateriality, the Court notes that "[t]he test for determining the materiality of the nondisclosure is whether a reasonable man would attach importance (to the fact not disclosed) in determining his choice of action in the transaction in question." *Holmes v. Bateson,* 583 F.2d 542, 557 (1st Cir.1978) (internal quotation marks omitted). Thus, the subjective belief of Bear Stearns, much less one employee of Bear Stearns, as to the materiality of the alleged misinformation is not dispositive of Local 710's application to represent the class.

The Supreme Court has recently set forth the elements of a securities fraud action as follows:

(1) a material misrepresentation (or omission); (2) scienter, i.e., a wrongful state of mind; (3) a connection with the purchase or sale of a security; (4) reliance, often referred to in cases involving public securities markets (fraud-on-the-market cases) as "transaction causation"; (5) economic loss; and (6) "loss causation," i.e., a causal connection between the material misrepresentation and the loss.

*Dura Pharm., Inc., v. Broudo,* No. 03–932, 2005 WL 885109, at *4 (U.S. Apr. 19, 2005) (internal citations and emphasis omitted); *see also Wortley v. Camplin,* 333 F.3d 284, 294 (1st Cir.2003). Even if McClusky took the stand at trial after reviewing all the pertinent evidence and reiterated his belief that he was not misled, a reasonable jury might still find in favor of Plaintiffs, particularly given that Bear Stearns is not a plaintiff in this case and has nothing to gain (and perhaps something to lose) by publicly accusing a company like Textron of fraud. In other words, McClusky's testimony would not in and of itself preclude a reasonable jury from concluding Plaintiffs have carried their burden of proof as to each of the required elements. Thus, this Court declines to hold that Local 710 is subject to a unique defense precluding its certification as class representative on the basis of McClusky's subjective belief as to whether or not he was deceived in deciding to purchase Textron stock.[3]

E. *Local 710 Profited From the Alleged Fraud*

■ Defendants cite *Kraus v. Paterson Parchment Paper Co.,* 65 F.R.D. 368 (S.D.N.Y.1974), for the proposition that Local 710 is atypical of the class because it profited from sales of Textron stock during the Class Period. *See id.* at 369 ("Kraus ... sold this stock ... during the period of the alleged frauds, at the inflated price

**3.** It could also be argued that McClusky's testimony serves as evidence sufficient to rebut the fraud-on-the-market presumption of reliance. In other words, McClusky's testimony could be heard to say: "We would have bought Textron stock at the same price even if we had all available information." However, in light of the fact that McClusky did not have access to all available information when he made his statement, and the fact that his testimony would be subject to at least some credibility attack, this Court will not conclude that McClusky's statement subjects Local 710 to a unique defense on the reliance element so as to preclude its certification as class representative.

attributable to it. In a sense, this makes Kraus a beneficiary of the alleged fraud and, at the least, puts him in a different position from the other victims of the alleged fraud whom he seeks to represent."). However, Local 710 purchased significantly more shares of Textron stock during the Class Period than it sold. According to an exhibit submitted by Defendants and not challenged by Plaintiffs as to its accuracy, (*see* Defs.' Suppl. Mem. Ex. A ("Local 710 Funds' Trading in Textron Stock")), during the Class Period, Bear Stearns, on behalf of Local 710, sold 36,000 shares of Textron stock for a total price of $1,863,553 while purchasing 91,600 shares at a total cost of $4,414,449.

"[T]he mere fact that a plaintiff sold stock during the class period does not in itself disqualify him from acting as class representative." *In re AM Int'l, Inc. Sec. Litig.*, 108 F.R.D. 190, 196 and n. 9 (S.D.N.Y.1985) (distinguishing *Kraus* and disagreeing with the "contention that any plaintiff who sold some shares for a profit during the class period, but suffered an overall loss, is an inadequate representative"). "It is well-established that individual questions with respect to damages will not defeat class certification or render a proposed representative inadequate unless that issue creates a conflict which goes to the heart of the lawsuit." *Id.* Here, the fact that Local 710 sold some shares of Textron stock during the Class Period does not, in light of the significantly greater number of purchases, create a conflict going to the heart of this lawsuit.

## V. *Swartchild's Adequacy*

■ "William Swartchild III is an individual investor who purchased 1,000 shares of Textron stock during the putative class period." (Defs.' Mem. in Opp. at 8 (citing Swartchild Dep. at 6, 7).) Defendants assert that Swartchild is not an appropriate class representative. First, Defendants argue that Swartchild "testified that he has no idea who would have decision-making authority on behalf of the class." (Defs.' Mem. in Opp. at 19 (citing Swartchild Dep. at 57)); *see Weisman v. Darneille*, 78 F.R.D. 669, 671 (S.D.N.Y.1978) (denying certification in part because "plaintiff knows none of the duties and responsibilities of a class representative"). Second, Defendants argue Swartchild "has a demonstrated history of abdicating decision-making authority to his counsel," as demonstrated by his not knowing the name of the co-lead plaintiff in his attorneys' earlier filings. (Defs.' Mem. in Opp. at 20 (citing Swartchild Dep. at 49).) They also point out that he has never had any communication with Local 710 in "the two and one-half years that this lawsuit has been pending," (*id.* at 20 (citing Swartchild Dep. at 56)), and has "no attorney-client relationship with either Futterman & Howard or Kirby McInerney & Squire, plaintiffs' proposed class counsel," (*id.* at 21 (citing Swartchild Dep. at 49)). *See Umsted v. Intelect Communications, Inc.*, No. Civ.A. 3:99–CV–2604, 2003 WL 79750, at *2 (N.D.Tex. Jan. 7, 2003) (including, in a litany of defects precluding certification of class representative, fact that proposed representative "could not identify the names of the attorneys who represented him" and "did not recognize or know the names of his co-lead Plaintiff"). Third, Defendants argue that Swartchild "has not read the pleadings prepared by counsel in this lawsuit 'terribly carefully,'" and "is unfamiliar with any government reports concerning the V–22 program, including the Blue Ribbon Report and Coyle Report, upon which plaintiffs purport to rely." (Defs.' Mem. in Opp. at 21 (citing Swartchild Dep. at 40, 43, 44)); *see Butterworth v. Quick & Reilly, Inc.*, 171 F.R.D. 319, 323 (M.D.Fla.1997) ("This Court determines that due to plaintiff's unfamiliarity

with the facts and essential elements of the case, plaintiff is not able to adequately protect the interests of the class."). Fourth, Defendants assert Swartchild is "either at odds with, or unsure about, many of the key allegations in the pleadings," as demonstrated by his testimony that he "didn't believe that [the V–22 program] was that large a part of [Textron's] business," and "that he did not think that the December 2000 crash of the V–22 was of major significance and that he was unsure about the cause and effect allegations in the Amended Complaint." (Defs.' Mem. in Opp. at 22 (citing Swartchild Dep. at 40, 43)); *see Rolex,* 136 F.R.D. at 666 ("Moreland has failed to demonstrate that he has sufficient familiarity with this case or sufficient resources to allow him to check the actions of counsel and truly serve as the representative of the proposed class."). Finally, Defendants point out that Swartchild was solicited to participate in the lawsuit. (Defs.' Mem. in Opp. at 23 (citing Swartchild Dep. at 46, 47)); *see Griffin v. GK Intelligent Sys., Inc.,* 196 F.R.D. 298, 302 (S.D.Tex.2000) ("Although it is clear that both Griffin and Farrell would like to recover their investment, it is equally clear that they are lending their names to a purported class action solely at the suggestion of lead counsel.").

Plaintiffs respond that Defendants' assertion that Swartchild does not know who will have decision-making authority for the class is a mischaracterization of Swartchild's testimony. Specifically, they point out Swartchild was not asked who would have decision-making authority for the class, but rather "who will make decisions regarding *whether to accept or reject settlement offers made to the class.*" (Pls.' Reply Mem. at 20 (citing Swartchild Dep. at 56–57) (emphasis in original).) Thus, argue Plaintiffs, "Mr. Swartchild's reply that he didn't know 'who will make the decisions' may well have reflected, innocu-

ously, his uncertainty concerning the relative decision-making authority he would hold relative to Co–Lead Plaintiffs in accepting or rejecting settlement offers." (*Id.*) Plaintiffs also argue that Swartchild's "recruitment" does not make him an inadequate class representative. They submit that Swartchild has not "simply lent [his] name[ ] to the litigation, without knowledge of or interest in the proceedings," *Fulco v. Cont'l Cablevision, Inc.,* CIV.A. No. 89–1342–S, 1990 WL 120688, at *3 (D.Mass. June 19, 1990), and that Defendants have not shown that Swartchild is a "mere alter ego[ ]," *id.,* for class counsel. They point out that Swartchild has demonstrated his involvement by "among other things, taking the time to travel to New York to give deposition testimony and answering defendants' other discovery requests." (Pls.' Reply Mem. at 21); *see In re Ins. Mgmt. Solutions Group, Inc. Sec. Litig.,* 206 F.R.D. 514, 517 (M.D.Fla.2002) ("The courts look more at the willingness of the class representative to participate in the action. This willingness, however, may be expressed merely by the class representative's compliance with discovery requests such as answering interrogatories or showing up for a deposition and answering questions."). Furthermore, according to Plaintiffs, the fact that Swartchild has not read the pleadings "terribly carefully" also does not preclude him from adequately serving as class representative. *See In re Ins. Mgmt. Solutions Group, Inc.,* 206 F.R.D. at 517 ("The law does not require that Mr. Schmidt understand the details and means by which the Defendants perpetrated the alleged fraud.... Minimal actions such as having read the complaint and asserting that a wrong occurred, although not understanding the exact nature of the wrong, may constitute a sufficient showing of lack of total abdication to counsel."); *see also Cheney v. Cyberguard*

*Corp.,* 213 F.R.D. 484, 495 (S.D.Fla.2003) (noting, in securities fraud action, that "where the class is represented by competent counsel, class certification should not be denied 'simply because of a perceived lack of subjective interest on the part of the named plaintiffs unless their participation is so minimal that they virtually have abdicated to their attorneys the conduct of the case.'") (quoting *Kirkpatrick v. J.C. Bradford & Co.,* 827 F.2d 718, 728 (11th Cir.1987)); *In re TCW/DW No. Am. Gov't Income Trust Sec. Litig.,* 941 F.Supp. 326, 340–41 (S.D.N.Y.1996) ("While familiar with the authority cited by defendants which finds a plaintiff without detailed knowledge of the underlying suit to be inappropriate as a class representative, the Court notes that many other courts, especially in complex securities fraud cases such as this one, do not impose such a requirement."). Finally, Plaintiffs point out that Defendants' assertion that Swartchild is at odds with key allegations in the pleadings ignores his statement that he was somewhat worried about the V–22 crashes "but felt based on what had been made public that it would not seriously impact Textron's earnings." (Pls.' Reply Mem. at 23 (quoting Swartchild Dep. at 38).)

Besides distinguishing Defendants' arguments as to Swartchild's adequacy on their face, Plaintiffs make a more global argument. They point out that the applicable standard for adequacy of class representatives requires them to make a particular two-part showing. "First, Plaintiffs must show 'that the interests of the representative party will not conflict with the interests of any of the class members, and second, that counsel chosen by the representative party is qualified, experienced and able to vigorously conduct the proposed litigation.'" *Kinney v. Metro Global Media, Inc.,* No. Civ.A. 99–579 ML, 2002 WL 31015604, at *5 (D.R.I. Aug. 22, 2002) (quoting *Andrews v. Bechtel Power Corp.,* 780 F.2d 124, 130 (1st Cir.1985)). They go on to point out that "Defendants do *not* claim that Mr. Swartchild's interests conflict with those of other proposed class representatives, nor do they claim that Mr. Swartchild's Counsel is *not* competent to litigate this action. Rather, defendants ask this Court to disqualify Mr. Swartchild on the ground that he is confused about some of the intricacies of the litigation." (Pls.' Reply Mem. at 18 (emphasis in original).)

In light of Plaintiffs' responses to Defendants' specific allegations concerning Swartchild, the applicable standard, and the fact that "[i]n the context of complex securities litigation, attacks on the adequacy of the class representative based on the representative's ignorance ... are rarely appropriate," *Kinney,* 2002 WL 31015604, at *5 (quoting *County of Suffolk v. Long Island Lighting Co.,* 710 F.Supp. 1407, 1416 (E.D.N.Y.1989)), this Court concludes Plaintiffs have carried their burden, however narrowly, as to Swartchild's adequacy as class representative. "[N]amed plaintiffs are not required to 'have expert knowledge of all the details of the case....'" *Id.*

## VI. *Conclusion*

For the foregoing reasons, this Court hereby ORDERS that Plaintiffs' Motion for Class Certification be GRANTED.

IT IS SO ORDERED.