**United States Court of Appeals**
**Fifth Circuit**

**F I L E D**

**October 24, 2005**

**Charles R. Fulbruge III**
**Clerk**

REVISED NOVEMBER 10, 2005

IN THE UNITED STATES COURT OF APPEALS

FOR THE FIFTH CIRCUIT

_____

No. 05-40636

_____

MICHAEL FEDER, ET AL.,

                                        Plaintiffs,

        versus

ELECTRONIC DATA SYSTEMS CORPORATION;
JAMES E. DALEY, Executive Vice President
and Chief Financial Officer; RICHARD H. BROWN,
Chairman of the Board and Chief Executive Officer,

                                        Defendants-Appellants,

        versus

DEPARTMENT OF THE TREASURY OF THE STATE
OF NEW JERSEY, Division of Investment on
behalf of Common Pension Fund A.,

                                        Appellee.

_____

Appeal from the United States District Court
for the Eastern District of Texas

_____

Before GARWOOD, SMITH and DeMOSS, Circuit Judges.

GARWOOD, Circuit Judge:

Appellants-defendants, Electronic Data Systems, Inc. (EDS), James E. Daley, and Richard H. Brown, appeal the certification of a Rule 23(b)(3) plaintiff class in this securities class action. A panel of this court granted defendants' petition for permission to appeal and we have jurisdiction to hear this interlocutory appeal under 28 U.S.C. § 1292(e) and Rule 23(f). Finding no abuse of discretion by the district court, we affirm the class certification.

**Facts and Proceedings Below**[1]

EDS is a Fortune 100 company that provides information technology outsourcing. On October 6, 2000, the United States Navy awarded a $6.9 billion contract to EDS to create a global intranet, known as the Navy Marine Corps Intranet (NMCI). To account for the NMCI contract, as well as other long-term contracts, EDS used the "percentage of completion" (POC) method of accounting, under which income is recognized as work on a contract progresses. On September 19, 2002, following a revised-earnings announcement by EDS made after the close of trading on September 18, EDS's stock price dropped from a September 18 close of $36.46 to a September 19 close of $17.20. This drop in price resulted in a one-day market loss of $9.7 billion. Securities holders thereafter brought

---

[1]More information about the facts of this case can be found in the district court's Practice and Procedure Order No. 20, granting class certification. See *In re Elec. Data Sys. Corp. Securities Litig.*, 226 F.R.D. 559 (E.D.Tex.2005). *See also In re Elec. Data Sys. Corp. Securities and "ERISA" Litig.*, 298 F. Supp. 2nd 544 (E.D. Tx. 2004) (denying defendants' Rule 12(b)(6) motion).

several class actions alleging, among other things, that EDS knew of serious problems with the NMCI contract and improperly used POC accounting to hide these problems and inflate the price of EDS stock.  In addition, the securities class action plaintiffs allege that EDS made material misrepresentations of its progress on the NMCI contract in filings with the Securities and Exchange Commission and in its press releases and that appellants Brown and Daley, EDS's former CEO and CFO, respectively, were responsible for the scheme to artificially inflate EDS stock price.  In addition to the suits filed by the securities holders, participants in EDS's retirement savings plans brought related suits alleging on a similar basis violations of the Employee Retirement Income Security Act (ERISA).  On March 7, 2003, the Multidistrict Litigation Panel transferred all related actions to the district court below for consolidated pretrial proceedings.  On May 5, 2003, the district court consolidated all of the securities actions brought against EDS and separately consolidated all of the related ERISA actions. Also on May 5, 2003, the Department of the Treasury of the State of New Jersey, including its Division of Investment on behalf of Common Pension Fund A (New Jersey), was appointed Lead Plaintiff under the Private Securities Litigation Reform Act of 1995 (PSLRA). This appointment of New Jersey as Lead Plaintiff was made subject to reconsideration at the class certification stage.

New Jersey engaged retired New Jersey Superior Court Judge C. Judson Hamlin (Hamlin) to oversee securities class actions in which

New Jersey was involved, including this one.  Hamlin is counsel at a private law firm, Purcell, Ries, Shannon, Mulcahy & O'Neill.  To enable Hamlin to oversee and coordinate its class actions, New Jersey delegated certain responsibilities to Hamlin, and Hamlin serves as New Jersey's principal liaison with class counsel.  Even though New Jersey has engaged Hamlin to fulfill this role, it is the class counsel for each class action case that is responsible for paying Hamlin's fees, not New Jersey.  It is the New Jersey Attorney General, however, who approves the payment of Hamlin's fees, and class counsel is required to pay all fees so approved.  Hamlin's fees are paid during the course of the case, and his fees are not contingent — Hamlin is paid the same amount whether or not New Jersey prevails.

On February 11, 2005, the district court certified the class pursuant to Rules 23(a) and 23(b)(3) of the Federal Rules of Civil Procedure and named New Jersey as class representative.[2] Appellants bring this interlocutory appeal, focusing primarily on New Jersey's arrangement with Hamlin and claiming error by the

---

[2]  The February 11 order defines the certified class as follows:

"All persons and entities who purchased or otherwise acquired the securities of Electronic Data Systems Corp. ("EDS") between February 7, 2001 through and including September 18, 2002 (the "Class Period"), and who were damaged thereby.  Excluded from the Class are defendants, members of the familiies of each the Individual Defendants, any parent, subsidiary, affiliated, partner, officer, executive, director of any defendant, any entity in which any such excluded person has a controlling interest, and the legal representatives, heirs, successors, and assigns of any such excluded person or entity."  Certification Order, 226 F.R.D. at 572.

4

district court in its decisions regarding adequacy, typicality, and superiority under Rule 23.

## Discussion

Rule 23(a) provides four prerequisites to a class action: "(1) numerosity (a 'class [so large] that joinder of all members is impracticable'); (2) commonality ('questions of law or fact common to the class'); (3) typicality (named parties' claims or defenses 'are typical ... of the class'); and (4) adequacy of representation (representatives 'will fairly and adequately protect the interests of the class')." *Amchem Products, Inc. v. Windsor*, 117 S.Ct. 2231, 2245 (1997). In addition to these prerequisites, a party seeking class certification under Rule 23(b)(3) must also demonstrate "both (1) that questions common to the class members predominate over questions affecting only individual members, and (2) that class resolution is superior to alternative methods for adjudication of the controversy." *Bell Atlantic Corp. v. AT&T Corp.*, 339 F.3d 294, 301 (5th Cir. 2003). In certifying the class and naming New Jersey the class representative, the district court found that New Jersey met all of these requirements. *In re Electronic Data Systems Corp. Securities Litigation*, 226 F.R.D. 559 (E.D.Tex. 2005) (hereinafter "Certification Order").

## I. *Standard of Review*

We review a district court's class certification decision for abuse of discretion. *Berger v. Compaq Computer Corp., 257 F.3d*

5

475, 478 (5th Cir. 2001) [*Berger I*].  "'Whether the district court applied the correct legal standard in reaching its decision on class certification, however, is a legal question that we review de novo.'" *Id.* at 479 (quoting *Allison v. Citgo Petroleum Corp.*, 151 F.3d 402, 408 (5th Cir. 1998)).  "A district court that premises its legal analysis on an erroneous understanding of the governing law has abused its discretion."  *Unger v. Amedisys Inc.*, 401 F.3d 316, 320 (5th Cir. 2005).

## II.  *Adequacy*

Appellants' principal argument on appeal is that New Jersey is not a proper class representative because it does not meet the "adequacy" prerequisite of Rule 23(a)(4).  Appellants challenge New Jersey's adequacy on three independent grounds.  First, Appellants make a novel two part argument centered around Hamlin's role in the litigation and his unusual fee arrangement.  Second, Appellants assert that New Jersey has a conflict of interest with the class because the accounting firm KPMG is New Jersey's auditor and was also EDS's auditor at the time of the alleged fraud.  Third, Appellants assert that New Jersey has a conflict of interest with certain class members who are also members of a class suing EDS separately for violations of ERISA.

We have identified a "generic standard" for the adequacy requirement, noting that "the class representatives [must] possess a sufficient level of knowledge and understanding to be capable of

6

'controlling' or 'prosecuting' the litigation." *Berger I*, 257 F.3d at 482–83. We have also noted that "the PSLRA raises the standard adequacy threshold" with its "requirement that securities class actions be managed by active, able class representatives who are informed and can demonstrate they are directing the litigation." *Id.* at 483. Although we noted that the PSLRA raises the adequacy threshold, we have "not, however, created an additional requirement under rule 23(a)(4) that . . . the putative class representative possess[] a certain level of experience, expertise, wealth or intellect, or a level of knowledge and understanding of the issues, beyond that required by our long-established standards for rule 23 adequacy of class representatives." *Berger v. Compaq Computer Corp.,* 279 F.3d 313, 313–14 (5th Cir. 2002) [*Berger II*]. The "long-established standard" for the adequacy determination on which we principally relied in *Berger I* requires "'an inquiry into [1] the zeal and competence of the representative[s'] counsel and . . . [2] the willingness and ability of the representative[s] to take an active role in and control the litigation and to protect the interests of absentees[.]'" *Berger I*, 257 F.3d at 479 (quoting *Horton v. Goose Creek Independent School Dist.*, 690 F.2d 470 (5th Cir. 1982)). In addition to determining the proposed class counsel's zeal and competence and the proposed class representative's willingness and ability, the district court's "adequacy inquiry also 'serves to uncover conflicts of interest

7

between the named plaintiffs and the class they seek to represent.'" *Id.* at 479-80 (quoting *Amchem Prods.*, 521 U.S. at 625, 117 S.Ct. at 2236).

### A.   *Hamlin's effect on New Jersey's adequacy*

Regarding Hamlin, Appellants argue (1) that the district court found New Jersey adequate only because of Hamlin's involvement, and (2) that New Jersey should not be allowed to rely on Hamlin to establish its adequacy because Hamlin is not New Jersey's employee, but is instead an independent lawyer engaged by New Jersey and, moreover, because Hamlin's fees are paid not by New Jersey, but by class counsel.  As discussed below, both arguments fail.

### 1.   *The district court's finding of New Jersey's adequacy*

The district court found that "New Jersey has proven that it is 'willing and able to take an active role in and control the litigation and to protect the interests of absentees.'" Certification Order, 226 F.R.D. at 567 (quoting *Berger I*, 257 F.3d at 479).

The district court also noted that "New Jersey, through its representative, Judge Hamlin, is taking an active role in the litigation, affirming its adequacy in protecting the absent class members." *Id.*  The district court's choice of the verb "affirming" indicates that it believes that New Jersey had already established that it would fairly and adequately protect the interests of the plaintiff class.  The district court also noted that "Hamlin's

8

presence helps New Jersey prove it has adequate involvement in the litigation and gives New Jersey the legal muscle a class representative should possess to actively and willingly control the litigation, which is exactly what the Private Securities Litigation Reform Act envisions." *Id.* at 568 (citing *Berger I*, 257 F.3d at 483). On this issue, the district court concludes, "In short, the arrangement with Judge Hamlin enhances New Jersey's ability to control the litigation." *Id.* Here again, the district court's choice of the words "helps" and "enhances" demonstrates that it did not, as appellants claim, find that New Jersey is adequate "solely" due to Hamlin's involvement.

In support of their argument, appellants point to the following statement by the district court: "Hamlin allows New Jersey to fill the 'unoccupied space' the Fifth Circuit envisions between the two extremes of expecting non-legal personnel to master every legal detail and otherwise legally uninformed plaintiffs deferring every decision to counsel." Certification Order, 226 F.R.D. at 568 (citing *Berger I*, 257 F.3d at 483). Appellants equate this statement to a holding that Hamlin, and Hamlin alone, "allows" New Jersey to qualify as adequate and "allows" New Jersey to fulfill its responsibilities. While this statement is somewhat helpful to Appellants' argument, it cannot carry the weight they place on it, especially as it is immediately followed by the statement identified earlier that "In short, the arrangement with

9

Judge Hamlin enhances New Jersey's ability to control the litigation." Certification Order, 226 F.R.D. at 568. Finally, appellants claim that "the District Court found that New Jersey has 'only generalized knowledge of the case.'" The district court would be surprised to learn of this "finding." Actually, the district court wrote: "*Defendants argue* that John McCormac, the Treasurer of New Jersey, Peter Langerman, the Director of the New Jersey Division of Investment, and other high ranking government officials have only generalized knowledge of the case." Certification Order, 226 F.R.D. at 568. Appellants' characterization of the district court's summary of their argument as a finding that their argument is correct is, at best, wholly lacking in merit.

Appellants also argue that the record compels a holding that, if New Jersey meets the Rule 23(a)(4) adequacy requirements, it is based solely on Hamlin. Appellants point to testimony in the record that they claim demonstrates the inadequacy of the actual New Jersey employees. For example, appellants rely on deposition testimony by Peter Langerman, New Jersey's Director of the Division of Investment, that "I do tend to accept at face value what my lawyers tell me. If that's an [infirmity], I guess that's a problem. But I do rely on my lawyers." As we noted in *Berger*, however, class representatives are entitled to rely to some extent

10

on counsel, although they should "know more than that they were 'involved in a bad business deal.'" *Berger I*, 257 F.3d at 483.

New Jersey, on the other hand, points to deposition testimony showing that Langerman understood the fraud-on-the-market theory of this case and that the focus of the suit is the improper booking of revenues, pursuant to the POC accounting system, under the NMCI Contract. Unlike the unsophisticated plaintiff in *Berger*, Langerman is an accountant with significant experience in investing and accounting, so there is no reason to suspect that his knowledge was derived solely from counsel (*e.g.* that he did not know himself what POC accounting was and why it was improper in this case). There is no abuse of discretion in making the judgment that, given his testimony and expertise, Langerman probably had an understanding of these issues that was not derived solely from counsel. Appellants also point to testimony where they say New Jersey State Treasurer John "McCormac admitted he does not review briefs or know any of the issues regarding class certification." As with Langerman, however, New Jersey is able to point to testimony reflecting McCormac's proper understanding of the case (McCormac's testimony summarizing the complaint: "The allegations are that the company improperly used a method of accounting known as percentage of completion, and as a result, financial results were misrepresented and fraud was perpetrated on the investors of the securities."). Furthermore, there is evidence that New Jersey

11

exercised control over the litigation. McCormack testified that the class period and the decisions to add potential defendants were made by Hamlin and the Attorney General's office, and that he had input into those decisions before the suit was filed. Additionally, Hamlin testified that he sends the Attorney General and two other people in his office every pleading filed in the case. Most importantly, the Attorney General's office would be involved directly in any settlement. In sum, there is evidence in the record to support a determination that New Jersey meets the adequacy requirements even without Hamlin.

2. *Can New Jersey rely on Hamlin to establish its adequacy?*

We turn now to appellants' argument that New Jersey's reliance on Hamlin violates the Rule 23(a)(4) guidance we provided in *Berger I*. Appellants claim that this "class certification ruling patently conflicts with *Berger*." We disagree.

a. *Hamlin's status as an outside lawyer*

Appellants note that Hamlin is an "outside lawyer" for New Jersey, and they claim that his involvement violates *Berger I*. In discussing the adequacy standards of Rule 23 in *Berger I*, however, we addressed the relationship between the class representative and the class counsel. We did not address the present situation in which another attorney, not affiliated with class counsel, is engaged by the class representative to assist it in its monitoring

12

of class counsel.[3]   The guidelines in *Berger I* do not prevent a proposed class representative from hiring an outside attorney (not affiliated with class counsel) to help the class representative in carrying out its role as such and in overseeing proposed class counsel, as long as that outside attorney has no conflicts with the class.[4]

While appellants correctly point out that class counsel cannot also serve as the class representative, the cases they cite do not reach the present situation.  In *Zylstra v. Safeway Stores, Inc.*, 578 F.2d 102 (5th Cir. 1978), cited by appellants, we emphasized the potential conflicts between the class counsel and the class itself, explaining:

> "We reach that conclusion because of the conflict of interest which is inherent in such a situation.  An attorney whose fees will depend upon the outcome of the case and who is also a class member or closely related to a class member cannot serve the interests of the class with the same unswerving devotion as an attorney who has no interest other than representing the class members."
> *Id.* at 104.

---

[3]Although our opinion in *Berger I* refers to "counsel," "lead counsel," "their counsel," "representatives' counsel," "plaintiffs' counsel," and "lawyers," all of these terms are used as synonyms for "class counsel."  One modifier for counsel that we did *not* employ in the *Berger I* opinion is "outside."  While Hamlin is admittedly an "outside lawyer," he is not class counsel.

[4]As the district court here observed, additional outside counsel with no potential conflicts with the class (i.e. counsel whose fees are not contingent upon the outcome of the litigation or on approval of class counsel) can help the class representative.  In *Berger I* we noted that "class representatives need not be legal scholars and are entitled to rely on [class] counsel."  257 F.3d at 483.  However, as we noted in *Berger I*, there are limits to this position because too much reliance by the class representative on class counsel shifts the balance of power and brings to the fore the potential conflicts of interest between class counsel and the class.  As the class representative becomes more competent in legal matters, it becomes less reliant on class counsel.

13

Similarly, in *Matassarin v. Lynch*, 174 F.3d 549 (5th Cir. 1999), also cited by appellants, we rejected an attorney's attempt to serve as both class counsel and class representative, noting that "her duty to represent class interests would impermissibly conflict with her chance to gain financially from an award of attorneys' fees." 174 F.3d at 559. The principal concern underlying the adequacy guidelines in *Berger I* is the protection of the due process rights of the absent members of the class. 257 F.3d at 480. In *Berger I*, as in *Zylstra* and *Matassarin*, we sought to avoid any conflict with the interests of the absent class members. *Id.* (citing *Amchem Prods., Inc. v. Windsor*, 521 U.S. 591, 625 (1997)). With Hamlin and New Jersey, the district court properly found no potential conflicts with the interests of the absent class members. Certification Order, 226 F.R.D. at 567.

 b. *The fact that Hamlin's fees are borne by class counsel*

The district court did "recognize[] that it would be troubling if Judge Hamlin, like outside counsel, was only paid if New Jersey prevailed, but this is not the case." *Id.* at 568. The district court reviewed the relevant features of Hamlin's compensation:

> "Judge Hamlin was retained by the Attorney General of New Jersey, and it is the Attorney General, not outside counsel, who can terminate his services. His compensation is determined by the Attorney General, not outside counsel. The Attorney General reviews and approves each bill Judge Hamlin submits, and only after the Attorney General reviews and approves the bill does outside counsel transfer payment to Judge Hamlin. . . .

14

> Judge Hamlin's compensation is assured for as long as he performs in a manner deemed satisfactory by the Attorney General of New Jersey. Judge Hamlin has great incentive to act objectively in protecting the interests of New Jersey and the class of plaintiffs, and little incentive to take actions adverse to New Jersey's interests." *Id.* at 567–68.

The evidence supports these findings and appellants do not serously argue otherwise. We agree with the district court's finding that Hamlin's pay arrangement does not create a conflict of interest with the class members. Hamlin is not a puppet of class counsel, and he does not answer to class counsel. On the contrary, Hamlin answers to the New Jersey Attorney General. Hamlin's pay is not contingent on the outcome of the class action, nor is it contingent on any approval thereof by class counsel or on keeping class counsel happy. Hamlin's interests are fully aligned with those of New Jersey, which are fully aligned with those of the absent members of the class.[5]

As part of their argument regarding Hamlin's pay, appellants claim that New Jersey, by requiring class counsel to pay Hamlin's fees, has established a "pay to play" arrangement in violation of the PSLRA and, therefore, should be deemed an inadequate class representative. For support, appellants point to the PSLRA requirement that the class representative file a sworn

---

[5] Even if these payments reduce New Jersey's litigation costs, they do not affect New Jersey's interest in a high settlement. New Jersey has every incentive to recover every penny of its more than $40 million in losses, which translates into a proportionally high recovery for the class. Thus, New Jersey's interests are aligned with those of the class.

15

certification that "states that the plaintiff will not accept any payment for serving as a representative party on behalf of a class beyond the plaintiff's pro rata share of any recovery, except as ordered or approved by the court in accordance with paragraph (4)." 15 U.S.C. § 78u-4(a)(2)(A)(vi).[6]

Although appellants attempt to characterize this arrangement as some sort of bribe to the state by describing it as, in effect, "giving New Jersey thousands of dollars for the right to represent the State," we find nothing improper about the actual arrangement. In this case, thousands of dollars are not being given to New Jersey, nor are thousands of dollars being given to a state official to influence his or her decision to hire class counsel. Instead, the requirement to pay Hamlin's compensation was an open part of the general proposal process for all law firms seeking to represent New Jersey in securities class actions. From the beginning, this was an understood uniform, specified cost of undertaking this legal work on a contingency basis. As New Jersey points out, "In contingent fee cases, counsel routinely agree to advance the value of their time and other expenses directly related

_____

[6] Section 78u-4(a)(4) provides:

"(4) **Recovery by plaintiffs**
    The share of any final judgment or of any settlement that is awarded to a representative party serving on behalf of a class shall be equal, on a per share basis, to the portion of the final judgment or settlement awarded to all other members of the class. Nothing in this paragraph shall be construed to limit the award of reasonable costs and expenses (including lost wages) directly relating to the representation of the class to any representative party serving on behalf of a class."

16

to the litigation."  The payments provided for clearly do not involve New Jersey receiving more than its portion, on a share basis, of any final judgment or settlement of the action so as to violate the first sentence of section 78u-4(a)(4); nor does the court's approval of the arrangement violate the second sentence of that section (see note 6 *supra*).  The evidence does not establish that this is a "payment for serving as a representative party" such that the PSLRA precludes the district court's approval of the arrangement and appointment of New Jersey as class representative.

B.    *New Jersey's alleged conflict with the class due to KPMG*

Appellants claim that New Jersey's failure to name KPMG as a defendant in this case, coupled with the fact that KPMG is New Jersey's auditor, demonstrates a conflict of interest with the class that should disqualify New Jersey from serving as class representative.  KPMG was EDS's outside auditor during the class period.  Because plaintiffs allege fraudulent behavior primarily associated with revenue reporting under the NMCI contract, appellants argue that "KPMG is a prime candidate to be a defendant in this case."  Appellants claim that "a class representative who fails to sue a potential defendant with which it has a professional or personal relationship is presumptively inadequate."  *Id.*  We reject appellants' contentions in this respect.

Appellants rely on *Paper Systems, Incorporated v. Mitsubishi Corporation*, 193 F.R.D. 601 (E.D. Wis. 2000), to support their

17

claim of presumptive inadequacy. In *Paper Systems*, the proposed class representative, Paper Systems, "caused its largest supplier to be dismissed as a defendant at the behest of Paper Systems' president, on the ground that he had 'a good relationship with them.'" *Id.* at 611. The *Paper Systems* court began its analysis with the observation that "generally, failure to join all defendants is a strategy choice, and except for a showing of unique circumstances, *is probably not a ground for finding inadequacy*." *Id.* (emphasis added). The court held that "Paper Systems' conduct in dismissing Appleton can in no way be considered a strategic decision on behalf of the class members it purported to represent. Paper Systems' actions appear to betray a conflict of interest between named parties and the class they seek to represent." *Id.* The court found Paper Systems' conduct to be proof of the unique circumstances needed for finding that Paper Systems was an inadequate class representative. *Id.*

Appellants' next authority is *Dubin v. Miller*, 132 F.R.D. 269 (D. Colo. 1990), where the court found that "Plaintiff's personal relationship with former director Dale Tower casts a further cloud upon plaintiff's suitability to fulfill his fiduciary role. Tower was a director for thirteen months during the class period, yet he has not been named as a defendant. . . . The omission to sue a potential defendant cannot but prejudice the class." *Id.* at 272. The *Dubin* court continued, however, noting that "While the

18

authorities cited by plaintiff do stand for the proposition that a class plaintiff need not join *every* possible defendant, plaintiff is obligated to supply a persuasive reason for the non-joinder." *Id.* at 273.

The final authority cited for appellants' proposition is *Kolin v. American Plan Corporation*, No. CV-84-3183, 1986 WL 36311 (E.D.N.Y. Apr. 3, 1986), where the court found inadequate a class representative who, due to family ties with potential defendants, was "unable to examine certain potential claims of the class." *Id.* at *8. The *Kolin* court noted: "The crux of the Rule 23(a)(4) requirement is that plaintiffs and plaintiffs' counsel not have any interests antagonistic to those of the class." *Id.*

We essentially agree with the statement in *Paper Systems* that "generally, failure to join all defendants is a strategy choice, and except for a showing of unique circumstances, is probably not a ground for finding inadequacy." 193 F.R.D. at 611. Even if these cases do support a presumption of inadequacy against a class representative who fails to sue a potential defendant, it is not a particularly strong presumption, and it is certainly not an irrebuttable one. In this case, any such presumption was rebutted by New Jersey. The district court found that "New Jersey has no self-interest in protecting KPMG," and "New Jersey has shown its zeal in pursuing class interests, even when those interests conflict with KPMG's interests." Certification Order, 226 F.R.D.

19

at 570.  Moreover, the district court noted that "New Jersey has also stated that it is willing to sue all viable defendants, even KPMG, if the facts lead there; thus far, the facts have not led to suing KPMG."  *Id.*  New Jersey also explains that its "decision not to sue KPMG was not based on any relationship it had with KPMG.  Rather, New Jersey's decision was based on the fact that EDS concealed its fraud from the market *and from KPMG*."  There are also valid strategic reasons for New Jersey to not name KPMG as a defendant.  We agree with the district court's conclusion on this issue: "New Jersey is only a client of KPMG – not vice versa – so it has no self-interest in appeasing KPMG. . . . New Jersey would not necessarily benefit financially by maintaining a good relationship with KPMG.  Thus, the Court does not believe there are unique circumstances here that threaten adequacy."  226 F.R.D. at 570.

    C.    *New Jersey's alleged conflict with certain class members due to the ERISA class action*

Appellants claim that New Jersey has a disqualifying conflict of interest with the interests of certain members of the proposed class who are also participants in EDS's 401(k) plan and, as such, have an ERISA class action pending against the same defendants.  The disqualifying conflict with the 401(k) participants, according to appellants, is that "the ERISA case is based on a broader theory of loss causation than the securities case and the two cases involve different measures of damages." Certification Order, 226

20

F.R.D. at 568 (footnote omitted). Because the theory of loss causation in the ERISA action is broader than the theory of loss causation in this securities case, appellants claim that the 401(k) participants will be judicially estopped from asserting their theory in the ERISA action. We disagree. "Judicial estoppel 'prevents a party from asserting a position in a legal proceeding that is contrary to a position previously taken in the same or some earlier proceeding.' The purpose of the doctrine is to prevent litigants 'from "playing fast and loose" with the courts . . . .'" *Hall v. GE Plastic Pacific PTE Ltd.*, 327 F.3d 391, 396 (5th Cir. 2003) (quoting *Ergo Science, Inc. v. Martin*, 73 F.3d 595, 600 (5th Cir. 1996)). Before a party can be judicially estopped, however, "it must be shown that 'the position of the party to be estopped is clearly inconsistent with its previous one; and . . . that party must have convinced the court to accept that previous position.'" *Id.* (quoting *Ahrens v. Perot Systems Corp.*, 205 F.3d 831, 833 (5th Cir. 2000)). Here, the district court hearing both cases explained how the position of the plaintiffs in the ERISA class is complementary with the position taken by the plaintiffs in the securities class. 226 F.R.D. at 569. Although the theories in each action are different, they are not mutually exclusive. *Id.*

For these reasons, we find that the district court applied the correct legal standard to its Rule 23(a)(4) adequacy determination and it did not abuse its discretion in finding that New Jersey will

21

fairly and adequately protect the interests of the absent class members.

## III. Typicality

The Appellants claim error by the district court in finding that New Jersey met the typicality requirement of Rule 23(a)(3). According to Appellants, New Jersey's claims are not typical of the claims of the class because there are three unique defenses applicable to New Jersey's claims.

### A. The effect of an "arguable" unique defense on class certification

According to appellants, "[a] class representative who could '*arguably*' be subject to unique defenses is both an inadequate and atypical class representative under Rule 23." Appellants' authorities, however, do not support this proposition. In each of the cases cited by appellants, the court of appeals upheld the district court's denial of class certification based on an arguable unique defense. What does not follow from these decisions, however, is that a court of appeals should usually reverse a district court's decision to certify a class after the district court considered and rejected defendant's arguable "unique defense" contention. On the contrary, these cases demonstrate the deferential review that courts of appeals give to the district

court's decisions regarding class certification.[7] Had the district court here *denied* class certification based on the unique defenses allegedly faced by New Jersey, then appellants' authorities would be helpful in showing how such a decision should not be overturned. But that is not the case, and we reject appellants' claim that the presence of an arguable unique defense necessarily destroys typicality.

B.    *The arguable "unique defenses" to New Jersey's claims*

1.    *New Jersey's post-disclosure purchases of EDS stock*

The first "unique defense" raised by Appellants is the fact that New Jersey purchased shares of EDS stock after the disclosure

---

[7]In *Warren v. Reserve Fund, Inc.*, 728 F.2d 741 (5th Cir. 1984), we upheld the district court's refusal of class certification, noting that, "While the availability or ultimate success of this [unique] defense . . . is not certain, we have held in the past that the presence of this characteristic peculiar to the named plaintiff does present a sufficient question of typicality to justify a district court's decision to deny class certification." *Id.* at 747 (footnote omitted). We also noted that "[t]he rationale behind this hesitance is a concern that representation of the class will suffer if the named plaintiff is preoccupied with a defense which is applicable only to himself." *Id.* Significantly, for the purposes of appellants' argument here, we then repeated our standard of review on class certification: "'The decision to grant or deny certification is initially committed to the sound discretion of the district judge and will not be overturned except for abuse of discretion.'" *Id.* (quoting *Redditt v. Mississippi Extended Care Centers, Inc.*, 718 F.2d 1381, 1387 (5th Cir. 1983)). Finding no abuse, we affirmed the district court. *Id.* Appellants' other authorities provide the same result. *See J. H. Cohn & Co. v. American Appraisal Associates, Inc.*, 628 F.2d 994, 999 (7th Cir. 1980) ("Under the circumstances, we cannot say that [the district court] arbitrarily refused to certify the class."); *Baffa v. Donaldson, Lufkin & Jenrette Securities Corp.*, 222 F.3d 52, 59 (2d Cir. 2000) ("We conclude that the district court did not abuse its discretion when it denied Dorflinger's motion to intervene as class representative.").

23

of EDS's alleged fraud.[8]  The district court addressed this argument, noting that "New Jersey was not alone in purchasing EDS securities after the September 18th [2002] announcement.  Other institutional investors, including several that may be members of this class, made similar purchases.  Like New Jersey, they felt EDS stock had hit a bottom and was thus a good buy at that point in time."  Certification Order, 226 F.R.D. at 565.  Nonetheless, appellants insist that a plaintiff who purchases a security after receiving notice of alleged fraud, as New Jersey did, is subject to a unique defense and is therefore necessarily atypical for purposes of Rule 23(a)(3).  We reject this argument.

In support of their proposition, appellants cite *Rolex Employees Retirement Trust v. Mentor Graphics Corp.*, 136 F.R.D. 658 (D.Or. 1991).  In *Rolex*, the district court found that "Rolex has not met its burden of satisfying Rule 23(a)(3) because the defenses Rolex must prepare to meet are not typical of the defenses which may be raised against the other members of the proposed class." *Id.* at 664.  Specifically, the district court noted that Rolex continued to trade in Mentor Graphics stock after the alleged misrepresentations and concluded that "Rolex may ultimately devote great effort toward the arguable defenses that arise from these facts.  Therefore, there is a substantial likelihood that if Rolex

_____

[8] New Jersey purchased some 17,000 shares September 20, 2002, 2,000 shares September 24, 2002, and some 500,000 shares in March 2004.

24

is named as the representative of the proposed class, defenses unique to Rolex could become the focus of the litigation to the detriment of the class." *Id.* While the holding in *Rolex*—that purchases of a company's stock after the disclosure of alleged fraud defeats typicality—is helpful to appellants' argument, it is not generally accepted.[9]

---

[9]A number of cases on both sides of the argument are identified in *Rosen v. Textron, Inc.*, 369 F.Supp.2d 204 (D.R.I. 2005). In *Rosen*, as in this case, the defendants claimed that typicality was not met because the proposed class representative had made post-disclosure purchases of defendants' stock. *Id.* at 208.

> "To support this proposition, Defendants cite *In re Safeguard Scientifics*, 216 F.R.D. 577, 582 (E.D.Pa.2003) (concluding lead plaintiff was subject to unique defenses in part because he 'increased his holdings in Safeguard stock even after public disclosure of the alleged fraud'); *Kovaleff v. Piano*, 142 F.R.D. 406, 408 (S.D.N.Y.1992) (finding unique defense where 'plaintiffs increased their holdings of Mizlou common stock after disclosure of the alleged fraud'); *Rolex*, 136 F.R.D. at 664 (concluding plaintiff was subject to unique defense where he 'continued to trade in the stock in Mentor Graphics after he learned of the alleged misrepresentations of defendants'); and *Epstein [v. American Reserve Corp]*, 1988 WL 40500, at *3-4 [N.D.Ill. Apr. 21, 1988] ('The problem in this case, however, is that Herb Jablin is subject to unique lack of reliance defenses. First, and most striking, is the fact that purchases of ARC securities were made in both the Epstein and Wenger accounts after the alleged fraudulent information had become known.')." 369 F.Supp.2d at 208–09.

The *Rosen* court then listed the cases that reject this proposition:
> "Plaintiffs, however, counter with several recent cases from many of the same jurisdictions, which they describe as constituting the majority view. *See In re Rent-Way Sec. Litig.*, 218 F.R.D. 101, 114 (W.D.Pa.2003) ('[T]hese purchases, having occurred after the putative class period, are irrelevant to the instant litigation.'); *In re Nortel Networks Corp. Sec. Litig.*, No. 01 Civ. 1855(RMB), 2003 WL 22077464, at *3 n. 4 (S.D.N.Y. Sept. 8, 2003) (rejecting argument that plaintiff's purchase of defendant's stock 'well after the alleged "fraud" was "exposed"' makes plaintiff atypical of class); *In re Frontier Ins. Group, Inc. Sec. Litig.*, 172 F.R.D. 31, 42 (E.D.N.Y.1997) ('The fact that Taub attempted to recoup her losses

We have not yet decided whether the purchase of a company's stock after disclosure of alleged fraud necessarily presents a unique defense against that purchaser such that Rule 23(a)(3) typicality is categorically precluded. In addition to the district court in this case, other district courts in this circuit have rejected this argument. *See, e.g.*, *Lehocky v. Tidel Technologies, Inc.*, 220 F.R.D. 491, 501–02 (S.D. Tex. 2004) (finding that "courts have ruled that purchases of stock by the class representatives after negative announcements during the class period or even after the close of the class period do not destroy typicality" and that "the key typicality inquiry is whether a class representative would be required to devote considerable time to rebut Defendants' claims."); *In re FirstPlus Fin. Group, Inc.*, 2002 WL 31415951, at *6 (N.D. Tex. Oct. 28, 2002) ("The Court disagrees with Defendants that this issue will present a sufficient distraction to render Doremus atypical."). We reject the argument that a proposed class representative in a fraud-on-the-market securities suit is as a matter of law categorically precluded from meeting the requirements of Rule 23(a) simply because of a post-disclosure purchase of the

---

by continuing to purchase Frontier stock after the disclosure of the alleged misrepresentations has no bearing on whether or not she relied on the integrity of the market during the class period.'); *In re Bally Mfg. Sec. Corp. Litig.*, 141 F.R.D. 262, 269 n. 7 (N.D.Ill.1992) ('Bally's contention that plaintiff Karinsky's claims are atypical because he purchased stock *after* the proposed class period is unavailing.') (emphasis in original)." 369 F.Supp.2d at 209.

defendant company's stock.  Reliance on the integrity of the market prior to disclosure of alleged fraud (i.e. during the class period) is unlikely to be defeated by post-disclosure reliance on the integrity of the market.  This seems particularly so after the stock price has been "corrected" by the market's assimilation of the new information.  As the district court noted, "both the high [pre-disclosure] and low [post-disclosure] prices were assumed accurate since the stocks were traded on an efficient market." Certification Order, 226 F.R.D. at 566.

2.    *New Jersey's questionable performance as a fund manager*

Appellants claim that New Jersey's mismanagement of its investment funds subjects it to a unique defense and thereby renders it atypical.  The district court, however, flatly rejected this argument as having "little bearing on New Jersey's ability to prosecute the losses specific to this case."  *Id.*  We generally agree with the following statement from *Cromer Finance Ltd. v. Berger*, 205 F.R.D. 113, 129 n.19 (S.D.N.Y. 2001): "Even where an investor seeks a risky investment and losses are foreseeable, he is still entitled to truthful and accurate information in making investment decisions. . . .  All persons entering into financial transactions are entitled to accurate information in assessing risk."  Whether or not New Jersey mismanaged its funds, it was "entitled to accurate information" from the market, and so the class's fraud-on-the-market claim will not suffer from any claims

27

of mismanagement. As the district court noted, "While New Jersey's pension fund may have made some poor investments, here New Jersey only seeks recovery for losses caused by EDS's conduct." Certification Order, 226 F.R.D. at 566.

*3. New Jersey's relationship with KPMG*

Appellants claim that New Jersey is rendered atypical because of the unique defense that its auditor is KPMG, and KPMG was also EDS's auditor during the class period. Appellants' theory is that "Defendants will be able to cross-examine New Jersey about why it feels comfortable relying on KPMG as its own auditor, and defendants can be expected to use that testimony to argue that they reasonably relied on KPMG as well." The district court rejected this argument, noting that "reliance on audits from a 'Big Four' accounting firm like KPMG does not alone make one subject to unique defenses." Certification Order, 226 F.R.D. at 565. As applied in this context, we agree with the district court.

We find that the district court did not abuse its discretion in finding that New Jersey's claim is typical of the claims of the class.

## IV. *Superiority*

Appellants claim that the superiority requirement of Rule 23(b)(3) is not met because New Jersey has not provided a trial plan, and that the district court's certification order in the absence of trial plan violates our holding in *Robinson v. Texas*

*Automobile Dealers Association*, 387 F.3d 416 (5th Cir. 2004). We did not hold in *Robinson*, however, that the submission of a trial plan was a prerequisite for a finding of superiority. Instead, we stated that "[a] court must consider 'how a trial on the alleged causes of action would be tried.'" 387 F.3d at 425 (quoting *Castano v. Am. Tobacco Co.*, 84 F.3d 734 (5th Cir. 1996)). In *Robinson*, the district court conditionally certified a plaintiff class and we held that "[t]he district court abused its discretion by finding that 'this class action is the superior method for adjudicating this controversy' and by not conducting any kind of analysis or discussion regarding how it would administer the trial." 387 F.3d at 425. The potential trial complications presented in *Robinson*, however, are quite different from those in this case. *Robinson* was an anti-trust case involving "[p]otentially, millions of consumers" and "over a thousand defendants." *Id.* at 420. Because the proposed class in *Robinson* included anybody who had purchased a new or used car in Texas between 1994 and 2003, the district court should have considered how it would find jurors who were not members of the class. *Id.* at 426. In addition, the district court in *Robinson* did not certify a defendant class, with the result that several hundred defendants (or more), each with the "absolute right to individually defend itself by presenting direct evidence," would expect to "offer a witness or two." *Id.* This securities fraud class action with three defendants does not present similar

29

challenges for the district court. In addition, unlike *Robinson*. the district court "has carefully considered any possible difficulties in a trial on the alleged cause of action." Certification Order, 226 F.R.D. at 571. Thus, as the district court found, "*Robinson* is inapplicable and New Jersey does not need to submit a trial plan to establish superiority." *Id.* The district court premised its legal analysis of this question on a correct understanding of the governing law, and it did not abuse its discretion in finding that New Jersey was not required to submit a trial plan as a prerequisite for finding that this class action meets the superiority requirement of Rule 23(b)(3).

## V. *The aggregate effects of Appellants' arguments*

Finally, appellants claim that "The rigorous Rule 23(a) analysis requires courts to consider arguments against class certification in the aggregate. . . . The District Court failed to make such a determination here, analyzing each argument individually and certifying the class despite substantial questions regarding New Jersey's adequacy and typicality." There is no indication that the district court believed it could not or should not consider appellants' arguments in the aggregate. Moreover, it is not clear why appellants claim that the district court did not consider the cumulative effect of their arguments, other than the fact that it rejected all of them. It is certainly not unusual that the district court's certification order addressed appellants'

30

arguments one by one. Appellants appear to be arguing that the district court, after rejecting each of appellants' arguments, must then also explicitly state that it considered the failed arguments in the aggregate and state whether they fail in the aggregate. This argument is without merit.

## Conclusion

For the foregoing reasons, the certification order of the district court is

AFFIRMED.[10]

---

[10] Appellee's motion to supplement the record on appeal is denied.